1  Dena S. Aghabeg, State Bar No. 185311
   daghabeg@cnc-law.com
2  COGSWELL NAKAZAWA & CHANG, LLP
   444 West Ocean Boulevard, Suite 1410
3  Long Beach, California  90802-8131
   Telephone (562) 951-8668
4  Facsimile: (562) 951-3933

5  Attorneys for Plaintiffs-in-Limitation, Defendants, Cross-Claimants, Third Party Plaintiffs and
   Third Party Defendants-in-Counterclaim LT LEASING, INC.; LM SPORTS, INC. dba
6  LAKESIDE MARINA and dba ACTION WATERSPORTS (erroneously sued as dba ACTION
   WATERSPORTS OF TAHOE) and Plaintiffs-in-Limitation, Cross-Claimants, Third Party
7  Plaintiffs and Third Party Defendants-in-Counterclaim LM SPORTS, INC. dba ACTION
   WATERSPORTS OF LAKE TAHOE and dba ACTION WATERSPORTS AT LAKE TAHOE;
8  TAMARA HASSETT, individually, and ROBERT HASSETT, individually

9
                          UNITED STATES DISTRICT COURT
10
                          EASTERN DISTRICT OF CALIFORNIA
11

12
   MANISHA PALLA,                        )  CASE NO.: 2:16-cv-02865-JAM-EFB
13                                        )
                                          )  MEMORANDUM OF POINTS AND
14              Plaintiff,                 )  AUTHORITIES IN SUPPORT OF MOTION
                                          )  FOR PARTIAL SUMMARY JUDGMENT
15        v.                              )  ON THIRD PARTY COMPLAINT
                                          )
16  LM SPORTS, INC. dba LAKESIDE          )  DATE:          July 24, 2018
    MARINA and dba ACTION                 )  TIME:          1:30 p.m.
17  WATERSPORTS OF TAHOE; LT              )  COURTROOM:     6
    LEASING, INC.; PAUL GARCIA; and       )  JUDGE:         Hon. John A. Mendez
18  DOES 1 through 50, inclusive,         )  TRIAL DATE:    October 29, 2018
                                          )
19              Defendants                )
                                          )
20  _____  )
    IN THE MATTER OF THE COMPLAINT        )
21  OF LT LEASING, INC.; LM SPORTS, INC.  )
    DBA LAKESIDE MARINA AND DBA           )
22  ACTION WATERSPORTS OF LAKE            )
    TAHOE AND DBA ACTION                  )
23  WATERSPORTS AT LAKE TAHOE AND         )
    DBA ACTION WATERSPORTS; TAMARA        )
24  HASSETT, INDIVIDUALLY; AND            )
    ROBERT HASSETT, INDIVIDUALLY          )
25                                        )
    _____  )
26                                        )
    LT LEASING, INC.; LM SPORTS, INC. dba )
27  LAKESIDE MARINA and dba ACTION        )
                                          )
28  _____
         MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
             PARTIAL SUMMARY JUDGMENT ON THIRD PARTY COMPLAINT

1   WATERSPORTS and dba ACTION                    )
    WATERSPORTS OF LAKE TAHOE and               )
2   dba ACTION WATERSPORTS AT LAKE              )
    TAHOE; TAMARA HASSETT, individually, )
3   and ROBERT HASSETT, individually            )
                                                                   )
4                 Cross-Claimants,                          )
                                                                   )
5          v.                                                     )
                                                                   )
6   PAUL GARCIA,                                         )
                                                                   )
7                 Cross-Defendant                         )
    _____)
                                                                   )
8   AND RELATED THIRD PARTY ACTION   )
                                                                   )
9   _____)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THIRD PARTY COMPLAINT

1

## **TABLE OF CONTENTS**

**Page**

I.      FACTUAL BACKGROUND.............................................................................................1

II.     STANDARD OF REVIEW..........................................................................................14

III.    AS A MATTER OF LAW, THIRD-PARTY PLAINTIFFS ARE ENTITLED
        TO PARTIAL SUMMARY JUDGMENT ON THEIR EXPRESS CONTRACTUAL
        INDEMNITY CAUSE OF ACTION ...........................................................................15

        A.      Applicable Law.................................................................................................15

        B.      The Indemnity Provision..................................................................................15

        C.      The Indemnity Agreement Is Valid and Enforceable under California
                as Well as Maritime Law...................................................................................16

        D.      The Indemnity Agreement Is Not Rendered Invalid By 46 U.S.C.A.
                § 30509...............................................................................................................19

IV.     THIRD-PARTY PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY
        JUDGMENT ON THEIR NEGLIGENCE/INDEMNITY CAUSE OF
        ACTION......................................................................................................................20

V.      DECLARATORY RELIEF SHOULD BE ENTERED IN FAVOR OF THIRD-
        PARTY PLAINTIFFS AGAINST THIRD-PARTY DEFENDANTS...........................21

VI.     CONCLUSION...........................................................................................................22

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                **Page(s)**

*Anderson v. Liberty Lobby, Inc.*

3        477 U.S. 242 (1986)........................................................................................14

4

5    *Bay Development, Ltd. v. Superior Court*

6        (1990) 50 Cal.3d 1012 ...................................................................................20

7    *Calderone v. United States*

8        799 F.2d 254 (6th Cir. 1986)...........................................................................14

9    *Celotex Corp. v. Catrett*

10        477 U.S. 317 (1986)........................................................................................14

11

12   *Charnis v. Watersport Pro, LLC*

        2009 WL 2581699, 2009 A.M.C. 1299 (D.Nv. 2009)......................................20

13

14   *Compania Anonima Venezolana de Navagacion v. A.J. Perez Export Co.*

        303 F.2d 692 (5th Cir. 1962)...........................................................................20

15

16   *Craine v. United States*

17        722 F.2d 1523 (11th Cir. 1984)........................................................................19

18   *Crawford v. Weather Shield Mfg., Inc*

19        (2008) 44 Cal.3d 541.......................................................................................17

20   *Cobb v. Aramark Sports and Entertainment Services, LLC*

21        933 F.Supp.2d 1295 (D.NV. 2013)..................................................................15

22

23   *Desert Outdoor Advertising v. Superior Court*

        (1st Dist. 2011) 196 Cal.App.4th 866.............................................................18

24

25   *E.L. White, Inc. v. City of Huntington Beach*

26        (1978) 21 Cal.3d 497................................................................................17, 20
       //

27     //

28

*East v. Premier, Inc.*
    98 Fed.Appx. 317 (5th Cir. 2004).......................................................................17

*Guerra v. Sutton*
    783 F. 2d 1371 (9th Cir, 1986)..........................................................................21

*Kam-Ko Bio-Pharm Trading Co. v. Mayne*
    560 F.3d  935 (9th Cir. 2009)............................................................................21

*Knott v. McDonald's*
    147 F.3d 1065 (9th Cir. 1998)...........................................................................19

*M/V AMERICAN QUEEN v. San Diego Marine Construction Corp.*
    708 F.2d 1483 (9th Cir. 1983)...........................................................................17

*Markley v. Beagle*
    (1967) 66 Cal.2d 951.......................................................................................17

*Rossmoor Sanitation , Inc. v. Pylon, Inc.*
    (1975) 13 Cal.3d 622 ......................................................................................17

*Rubin v. Aggressor Fleet, Inc.*
    2009 WL 10679970 (E.D. La. 2009)..................................................................18

*Sander v. Alexander Richardson Investments*
    334 F.3d 712 (8th Cir. 2003)........................................................................17, 19

**Rules**
46 U.S.C. § 183c................................................................20
46 U.S.C.A. § 30509..........................................................19

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

3

## I.   FACTUAL BACKGROUND

4    On July 24, 2016, Claimant and Plaintiff Manisha Palla ("Palla"), then 22 years old,

5 sustained injury, resulting in the amputation of her right leg above the knee, after her legs got

6 caught in the counter-rotating propellers of a1997 24', Four Winns 240 Horizon, CF 6210 LE

7 (also referred to herein as the "Vessel" and as the "rental boat") as she approached the Vessel

8 from the water after tubing on Lake Tahoe (hereinafter referred to as the "incident.") Fact 1.  The

9 Vessel involved in the incident was owned by LT Leasing, Inc. (hereinafter, "LT Leasing") and

10 was leased by LT Leasing to LM Sports, Inc. (hereinafter, "LM Sports."), which latter entity

11 operates under the fictitious business names of Lakeside Marina, Action Watersports of Lake

12 Tahoe, Action Watersports at Lake Tahoe and as Action Watersports.  Fact 2.  Robert Hassett

13 (hereinafter, "Hassett") is the President of LM Sports and the Chief Financial Officer ("CFO") of

14 LT Leasing and Tamara Hassett (hereinafter, "Tamara") is the President of LT Leasing and the

15 CFO of LM Sports.  Fact 3.  Hassett and Tamara (hereinafter, jointly referred to as "the

16 Hassetts") are the sole shareholders of LM Sports and LT Leasing.  Fact 4.

17    On the date of the incident, Palla, an SAP America ("SAP") employee, had been visiting

18 South Lake Tahoe for the weekend along with co-workers who had all been attending SAP

19 training in Northern California.  Fact 5.  One of Palla's co-workers, Evan Botwin (hereinafter

20 "Botwin"), had made an online reservation with LM Sports dba Lakeside Marina (hereinafter

21 "Lakeside Marina") to rent the Vessel to go boating and tubing on Lake Tahoe, and Palla had

22 expressed interest in participating in the boat rental activity prior to leaving for Lake Tahoe.  Fact

23 6.  In addition to Palla and Botwin, eleven other co-workers participated in the rental boat

24 activities on the date of the incident, including: Paul Garcia ("Garcia") Regan Roberts

25 ("Roberts"), Nick Carscadden ("Carscadden"), Sean O'Dea ("O'Dea"), Efe Ozyurt ("Ozyurt"),

26 Christa Wolf ("Wolf"), Frances Copeland ("Copeland"), Erlinda Lesi ("Lesi"), Elena Legramanti

27 ("Legramanti"), Benoit Gautier ("Gautier") and Alvaro Gilsanz -Herranz ("Herranz")

28

1   (hereinafter, the thirteen participants are referred to as the "Palla Group").  Fact 7.

2   The Vessel complied with all U.S.C.G. regulations and had two manufacturer's warning
3   labels addressing the importance of turning the engine off when using the swim ladder, one at the
4   Vessel's helm (dashboard) stating: "PREVENT PERSONAL INJURY.  ENGINE(S) MUST BE
5   OFF WHEN USING SWIM PLATFORM LADDER," and a second warning label affixed to the
6   transom of the vessel above the handrail by the swim ladder, which read: "DANGER: MAKE
7   SURE ENGINE IS OFF AND PROPELLER IS STOPPED BEFORE USING BOARDING
8   LADDER."  Fact 8.  The Vessel had an inboard/outboard engine with a "dual prop," which is a
9   counter-rotating propeller.  Fact 9.

10   Botwin and those who had arrived with him, which included O'Dea, Carscadden, Ozyurt
11   and Roberts (collectively referred to as the "Five Members") were the only people from the Palla
12   Group who, after arriving to Lakeside Marina, went into the marina's rental office.  Fact 10.
13   The Five Members were well-educated: Botwin was a graduate of Duke University; Roberts
14   graduated from Dartmouth College; Carscadden testified as to having received a degree in
15   business studies; O'Dea graduated from Villanova and Ozyurt had an Industrial Engineering and
16   Master's Degree in Business Information Systems.  Fact 11.  Although the recollections of the
17   Five Members who went into the rental office varied in regard to with whom they had interacted
18   inside the office, the group in fact was assisted by Lakeside Marina rental office staff member
19   Julia Hontos (hereinafter, "Hontos").  Fact 12.  As of the date of the incident, Hontos had been
20   working at Lakeside Marina for approximately seven weeks, having been trained to perform her
21   duties by General Manager, Dan Meeks (hereinafter, "Meeks"), who had been employed by
22   Lakeside Marina for approximately 13-14 years, and Assistant Manager, Joel Baker (hereinafter,
23   "Baker"), which training included her having been "shadowed" by Meeks or Baker for the
24   approximate period of two weeks before she was permitted to assist customers independently.
25   Fact 13.

26   Hontos performed her job duties in regard to the Five Members, which job duties included
27   going over with them: the rental contract and liability release (since they were eighteen years of

28

1 │ age or older), Lakeside Marina's rules and regulations sheet (which covered, among other things,

2 │ life jacket requirements, navigational buoys, restricted areas, speed zones, seating in the vessel,

3 │ information to the effect that the propeller would be shown prior to their taking the boat and that

4 │ they would be charged for any damage done to the propeller during the rental), ensuring that they

5 │ signed the rental contract and liability release and that the primary lessee, Botwin, signed

6 │ Lakeside Marina's boating rules, stressing to them that boating is just as much dangerous as it is

7 │ fun, and instructing them that there was to be no swimming from the boat, that they should

8 │ contact 911 for emergencies and should call Lakeside Marina's office in case of breakdowns or

9 │ other issues that arose (pointing out that Lakeside Marina's phone number was on the rental

10 │ contract), offering them a map of Lake Tahoe showing areas where the rental boat could not be

11 │ taken and confirming that they did not have any questions. Fact 14.   Botwin declined to take the

12 │ offered map because he did not think that it would be helpful.  Fact 15.

13 │ The Five Members executed the Rental Contract and Release of Liability and Indemnity

14 │ Agreement (hereinafter the "Agreement") with Botwin, as the primary lessee on behalf of the

15 │ Palla Group, affirming that he read and understood, before executing both the Agreement, as well

16 │ as the Lakeside Marina's rules sheet.  Fact 16.  It was only sometime after Botwin and the four

17 │ others had left the rental office that a computer became available to Hontos to check the

18 │ reservation, and Hontos saw that the reservation was for thirteen people, and immediately

19 │ advised Baker, who was working in the office with her that day, that not everyone in the group

20 │ had executed the Agreement, and Baker apparently unsuccessfully tried to reach Botwin on his

21 │ cell phone to have the group return to the marina.  Fact 17.

22 │ In the Agreement, "**LAKESIDE**" is defined on the front of the Agreement to collectively

23 │ refer to "**LM SPORTS, INC., dba LAKESIDE MARINA, and dba ACTION**

24 │ **WATERSPORTS, and LT LEASING, INC.,**"contained terms on both its front side and back

25 │ side. (Emphasis in Original). Fact 18.  On the front side of the Agreement, in bigger font, and

26 │ above the lines clearly designated for "Lessee's' Printed Name & Signature" states: 'THE

27 │ LESSEE HAS READ AND AGREES TO THE CONDITIONS PRINTED ON **BOTH SIDES**

28 │

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THIRD PARTY COMPLAINT

- 3 -

1   [enlarged on the Agreement] OF THIS CONTRACT.'" (Emphasis in Original).  Fact 19.

2

3   The Agreement  provides, *inter alia*:

4       "I or my child (collectively, 'Participant,' 'I,' 'me,' or 'my') have voluntarily

5       agreed to participate in activities offered by LAKESIDE.  'Activities' may include

6       boat, personal watercraft, pedal boat, kayak, or SUP rental and use, in addition to

7       parasailing, swimming, diving, tubing, waterskiing, wakeboarding, and/or any

8       other activities incidental to those offered by LAKESIDE (collectively, 'the

9       Activities').  I understand that **MY PARTICIPATION IN THE ACTIVITIES**

10      **CAN BE HAZARDOUS AND POSE RISKS OF INJURY AND DEATH** to

11      me and/or my property.  I further understand and acknowledge that

12      **ATTENDING, OBSERVING, OR MERELY BEING IN THE PROXIMITY**

13      **OF THE ACTIVITIES, EQUIPMENT, OR FACILITIES EXPOSES ME TO**

14      **RISKS** posed by conditions, individuals, equipment, or events which have

15      potential to cause death, serious injury, disability or property loss."

16

17  Fact 20.

18      On the front side of the Agreement, there appears several lines above the lessees'

19  signatures: 'THE LESSEE HAS READ AND AGREES TO THE CONDITIONS PRINTED ON

20  **BOTH SIDES** [enlarged on the Agreement] OF THIS CONTRACT.'" Fact 21.  The

21  "Participant," as defined in the Agreement "shall mean the person listed on [the Agreement.]"

22  Fact 22.

23      The Agreement's terms continue on the back side of the document, and provide as

24  follows in the first paragraph:

25      **"THE RISKS OF THE USE OF EQUIPMENT AND ACTIVITIES**

26      **OFFERED BY LAKESIDE ARE INHERENT AND ARE TOO**

27      **NUMEROUS TO LIST, BUT INCLUDE:** Changing weather or water

28

1    conditions; debris; tides; currents; shallow water; wake action; slips; falls;

2    collisions, including but not limited to, collisions with other participants, boats,

3    watercraft, and other manmade and natural objects; capsizing; sinking; drowning;

4    exposure to elements, including cold lake temperatures; hypothermia and heat

5    exhaustion; equipment failure and/or defects; operator error; and mental distress

6    from exposure to any of the above.  The risk of injury due to a third party's

7    inattention, carelessness, recklessness, or negligence while participating in the

8    Activities is great - at all times I must be diligently aware of my surroundings."

9

10   Fact 23.

11       The Agreement also provides, *inter alia*, that the equipment provided by LAKESIDE,

12   including "boats, personal watercraft, pedal boats, kayaks, SUP's, personal floatation devices,

13   paddles, and any other item necessary and incidental to the operation or performance of such

14   Equipment" must be accepted "AS IS" with no warranties, express or implied" and additionally

15   requires the Lessee to affirm that, "[d]espite the risks involved, and in consideration of the right

16   to participate in the Activities, be present at the Facilities, and use the Equipment," he or she

17   "...**VOLUNTARILY AGREE TO EXPRESSLY ASSUME ALL RISKS OF INJURY,**

18   **ILLNESS, OR DEATH** that might be associated with participation in the Activities, presence at

19   the Facilities, or use of the Equipment." Fact 24.

20       Lakeside Marina's procedures included having their customers read and sign the

21   Agreement in order to acknowledge responsibility for their own actions, as well as the potential

22   dangers inherent to water sports.  Fact 25.   The Agreement contains the following release and

23   indemnity provision: As consideration for being permitted to participate in the Activities and for

24   use of the Facilities and Equipment, **I AGREE TO RELEASE FROM ANY LEGAL**

25   **LIABILITY, AGREE NEVER TO SUE, AND AGREE TO DEFEND, INDEMNITY AND**

26   **HOLD HARMLESS, LAKESIDE**, as defined above, its owners, investors, officers, directors,

27   lenders, managing agents, employees, agents, landowner, landlords, and all affiliated companies,

28

1  for injury, death, or property damage to myself or third-parties resulting from my participation in
2  the Activities, regardless of the cause to the fullest extent allowed by law, including the alleged
3  **NEGLIGENCE of LAKESIDE**.  I understand this release of liability will have the same effect
4  as to any action brought by my child, heirs assigns, or legal representatives in the event of injury,
5  death, property damage from the Activities, Facilities, and Equipment.  Fact 26.

6  Further, per the terms of the Agreement, the Lessee must "warrant and represent that" he
7  or she "will comply with all California, Nevada, and Federal safety/navigational rules and
8  regulations for boating on the waterways upon which the Equipment will be used during the
9  rental period" and that he or she has "received and will comply with any rules, instructions,
10  and/or requirements pertaining to the Activities and Equipment provided by LAKESIDE."  Fact
11  27.

12  The Agreement provides that "[a]ny disputes will be subject to and determined under the
13  laws of California."  Fact 28.

14  Lakeside Marina's procedures included having their customers read and sign the
15  Agreement in order to acknowledge responsibility for their own actions, as well as the potential
16  dangers inherent to water sports.  Fact 29.  Although per Lakeside Marina's procedures, all of the
17  Palla Group, including Garcia, should have been required to review and sign the rental contract,
18  Palla, Garcia and the remaining members of the group had not gone into the rental office, instead
19  staying in the area outside of Lakeside Marina's rental office, and after all members of the Palla
20  Group had arrived to Lakeside Marina, the Palla Group, walked to the dock area where the rental
21  boat was located.  Fact 30.

22  At the dock, per Lakeside Marina's procedure, Dock Hand/Boat Attendant Mathan Foss
23  ("Foss"), then working his third season at Lakeside Marina, and having previously checked out
24  hundreds of boats, had ascertained who in the Palla Group had rented the Vessel and who
25  intended to operate the Vessel.  Fact 31.  As a Dock Hand, Foss' duties included, among other
26  things, teaching people how to operate boats, including getting the customers briefed, out on the
27  boat and safely out of the marina.  Fact 32.

28

1    Hassett, who has been operating boats for approximately 45 years and has a U.S. Coast

2   Guard Masters license, personally oversees Lakeside Marina's operations, setting forth the

3   manner in which its guests are educated on the proper use of rental boats and on safety aspects

4   and communicating those procedures to Lakeside Marina's managers, who in turn, train the staff

5   members. Fact 33. Hassett had personally communicated and explained the job duties of

6   Lakeside Marina staff to its long-time manager in their conversations and meetings. Fact 34.

7   Lakeside Marina also has staff meetings to discuss check-out procedures, safety procedures,

8   interacting with customers and ensuring that the customers are paying attention, which meetings

9   Hassett himself sometimes attends. Fact 35. Hassett is present at Lakeside Marina and at each of

10   the other three marinas he operates an estimated four to six times per week to personally observe

11   what the employees are doing. Fact 36.

12    On the date of the incident, Lakeside Marina's procedures mandated that those who

13   would be operating the boat receive personal instruction from the Lakeside Marina dock hand in

14   regard to the safety features and operation of the boat, including the safety instruction of shutting

15   off the engine before passengers boarded the boat from the water, as opposed to relying upon

16   neutral. Fact 37. When he began his employment at Lakeside Marina during the summer of

17   2014, Foss had been trained by managers and more experienced personnel at Lakeside Marina on

18   the information, *i.e,* "spiels" to be provided to customers, initially having "shadowed" the more

19   experienced employees, after which he had then been "shadowed" himself and tested to ensure

20   that he had the necessary skills to do an appropriate boat checkout before he was allowed to

21   check out boats to anyone. Fact 38. Lakeside Marina would provide Foss with additional formal

22   training at the beginning of each season, and in addition, periodically, Hassett or Meeks would

23   come over to the dock area where Foss was interacting with customers giving his "spiel" to listen

24   in from a distance of approximately 5' away to ensure that Foss was still performing his duties

25   correctly Fact 39. Hassett had watched Foss perform the boat check-out procedure "multiple

26   times," including when boat rental customers were checking out a tube, and had consistently

27   found Foss' spiels to be complete and to flow well, testifying that he had never witnessed Foss

28

1   omitting the discussion of the necessity of shutting off the engine when the rental boat activity

2   would involve people going in the water, and nor had he ever heard Foss refer to the "neutral"

3   position of a boat throttle as the "off" position.  Fact 40.

4       In response to Foss asking Botwin and Garcia about their boating experience, Garcia had

5   represented himself to Foss as an experienced boat operator and Garcia had appeared very

6   confident. Fact 41.  Members of the Palla Group had confidence in Garcia's abilities to operate

7   the rental boat, as Garcia had represented himself to members of the Palla Group as an

8   experienced boat operator who had a boat license in his native country of France, with members

9   of the Palla Group understanding either that Garcia or Garcia's family had a boat in France.  Fact

10  42. Neither Foss or Garcia believe that they had any communication problems in regard to their

11  interaction and Garcia denied feeling as though he needed assistance translating what Foss, *i.e.*,

12  "the boat rental employee" was saying. Fact 43. In testifying in this matter, Botwin affirmed that

13  while they were receiving the instructions, Garcia was nodding in affirmation, agreeing with the

14  instructions being provided by the boat rental employee. Fact 44.

15      Irrespective of Garcia's representation regarding his experience operating boats, as he had

16  been trained to do, Foss went over his "spiel" with Botwin and Garcia, going over with them the

17  items he had been trained to do, including among other things: (1) raising up the Vessel's

18  propellers to show Botwin and Garcia and explaining that they would be liable for any damage

19  done to them; (2) showing them the Vessel's safety equipment including: (a) the life jackets (and

20  counting the number of life jackets to ensure there were enough on the boat for the number of

21  people going out on the boat); (b) the fire extinguisher; (c) the ski flag (and telling them the flag

22  was to be used when anyone falls off of the tube and was to remain in the air until the persons

23  tubing were back on the boat and everything was clear, at which time the flag could come down);

24  (d) the oar (telling them it was not for "paddling back here because they're not going to make it";

25  and (e) the throw cushion (telling them that it was an actual floatation device to give to someone

26  to grab onto until the operator picked them up); (3) instructing them as to the operation of the

27  Vessel, showing them: (a) the key and how to turn the Vessel on and off; (b) the throttle and

28

1   telling them it must be locked in neutral in order to start the boat; and ( c) the kill cord and

2   advising them that it sometimes gets knocked out, advising them that if the boat will not start, to

3   first check those two things (the throttle and the cord) but if still unable to start the boat, to call

4   the marina at the number on the contract.  Fact 45.

5       Foss showed the two would-be operators of the Vessel the propeller, having raised it up

6   out of the water by putting the rental boat in trailering mode, as well as where to shut off the boat

7   using the key, as well as instructed them regarding the kill cord.  Fact 46.  In discussing with

8   Botwin and Garcia the propellers of the rental boat, Foss advised them that they would not be

9   charged for any prior damage to the propellers, which in this instance, would only have consisted

10  of "a little nick" or "a couple of dings," but nothing of the nature impairing the rental boat to not

11  be able to be taken out. Fact 47.  When Foss raised the propellers up, Botwin and Garcia were in

12  the boat leaning over the edge of the boat to see the propeller while others in the Palla Group,

13  who per Botwin's observation, were "standing right there, were either watching Botwin's and

14  Garcia's interaction with Foss, or were talking amongst themselves. Fact 48. In showing those

15  intending to operate the boat the throttle, Foss had been trained to clarify for the operators the

16  difference between shutting off the boat and placing the boat in neutral, and had never referred to

17  the middle position as "off."  Fact 49.

18      In providing instruction to customers regarding the throttle, Foss would repeat himself a

19  lot and in addition to showing them the "neutral" position and explaining that the throttle had to

20  be locked in neutral in order to start the rental boat, he would explain to them that they needed to

21  click the lever underneath to be able to move the throttle forward, and would "have them feel

22  that," and he would additionally show them the positions for: (a) idle speed forward explaining

23  "that is your five miles an hour" to be used to get out of and into the channels and into Emerald

24  Bay; (b) full throttle and how to shift back to neutral; and (c) reverse and would tell them "there

25  should be no reason you need reverse, especially with a tuber, and that if they did use reverse, to

26  make sure they did not go too fast in reverse, because it would cause water to over the transom

27  (and Foss would also show them were the bilge pump on the dash was).  Fact 50.  When showing

28

1  the would-be operators how to use the throttle, Foss would generally stand behind the seat (by

2  the helm) if the would-be operator would like to sit, or he and the would-be operators would

3  stand around the helm while he explained it. Fact 51. In testifying regarding the boat check out

4  procedure as it pertained to tubing safety instructions to be provided, as had been discussed at a

5  July 8, 2016 Lakeside Marina safety meeting conducted by Meeks that Foss had attended, and as

6  was provided to members of the Palla Group, Foss testified, *inter alia:*

7          "Well, first and foremost, turn the boat off any time anybody is in

8          the water. I mean, I go over that. I repeat that a lot. Don't rely on

9          neutral. Always mind the rope and where the rope is at, and that it

10          could be dangerous. Don't ever let it – as it's going out of the boat

11          and you're going into the water, make sure it's not wrapped around

12          you (the tuber or anybody on the boat) at all. Make sure you

13          always wear a life jacket. ... as the tube is going out and the boat is

14          pulling away, the rope is coming out of the boat ... so make sure

15          that rope is not wrapped around anybody as it's going out either. ...

16

17          Also the ski flag, and that would be your observer, and make sure

18          they are always watching the tuber or skier or wake boarder, and as

19          soon as they fall, make sure that flag goes up in the air and remains

20          in the air until they are back on the boat and everything is clear

21          from the propellers. ...

22

23          Make sure you pull up on the driver's side. It's very hard to see

24          people on the passenger's side. You don't want to pull up too

25          close to them. Obviously, you don't want to run them over. And

26          once you get in about the same space as the driver, make sure you

27          turn the boat off. That way there is no chance that the propellers

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THIRD PARTY COMPLAINT
- 10 -

1      are still spinning.  Once the boat is off, then they can swim back to

2      the boat, use the ladder to get back on to the boat.  Then once

3      everything is clear you can turn the boat back on.

4

5      If they are going to go again instead of getting back on the boat,

6      then you would bring the rope to the skier or tuber and have them

7      grab the rope.  Again, make sure the boat is off.  And if you need

8      to, you can use the rope to pull them in and help them get on to the

9      tube."

10   Fact 52.

11       As he had been trained to do, however, Foss focused on ensuring that he had the attention

12   of those who would be operating the rental boat, and who would therefore be in control of its safe

13   operation, Botwin and Garcia, in providing personal instruction in regard to the operation of the

14   Vessel, as opposed to directing the instructions to a renter who would not be in control of the

15   Vessel.  Fact 53.   Though conceding that he did not remember every instruction that was

16   provided by the Lakeside Marina employee, Botwin has testified in this action that he was "sure"

17   the Lakeside Marina employee "mentioned neutral" and that the employee used the terms

18   "neutral" and "off," with "off" being used in the context of "shut the engine off" and that the

19   Lakeside Marina employee used the throttle to show where neutral was and had also mentioned

20   shutting off the boat."  Fact 54.  Meanwhile, Garcia has testified, "honestly, I don't remember

21   details," when asked what he remembered the staff member stating to him and Botwin.  Fact 55.

22   While instruction was being provided, although some were watching, many of the members of

23   the Palla Group, including Palla, were talking and socializing.  Fact 56.

24       Foss confirmed that Lakeside Marina's procedures include showing the ski flag to the entire

25   group, mainly because there needs to be an observer for the tube, and it is up to the group to

26   designate the observer, and that in this instance, in addition to his having the attention of both

27   operators while providing that instruction, he saw that some of the other members of the Palla

28

1    Group on the dock were listening. Fact 57.   As Foss operated the rental boat out of the marina,

2    those who had signed up to be the operators were nearby and Foss' Vessel operational

3    instructions continued.  Fact 58.  As he drove groups out of the marina, Foss would point out

4    landmarks for the customers to look for when returning back to the marina, and he would point

5    out the red and green buoys marking the channel advising that the rental boat should be navigated

6    through the channel because the water was deeper there. Fact 59.  Although Foss did not use a

7    written checklist that he used when going over the safety equipment and operation of the Vessel,

8    he did not feel that he needed one because having the boat itself in front of him served as his

9    "checklist. Fact 60.

10          Although Foss was accustomed to dealing with large groups in performing his duties as a

11   Dock Hand, and he had tried to get the members of the group's attention, trying to speak loudly

12   enough so that anyone in Palla's Group could hear what he was stating, his getting the attention

13   of all thirteen people was challenging because the members of the group were on their cell

14   phones, talking and chatting amongst themselves, going back and forth to the restroom; however,

15   as Foss was providing instructions regarding the ski flag, he recalled that members of the group

16   about to board the rental boat were right there at the dock listening and he felt as though he had

17   the attention of at least 5-6 other people, in addition to the operators.  Fact 61.

18          Irrespective of Botwin's understanding that Garcia would be the primary operator of the

19   rental boat, both Botwin and Garcia appeared to be paying attention to all of the instructions

20   provided by Foss, although Botwin admitted that he himself likely would have been more

21   engaged and would have asked more questions had he thought that he was going to be the sole

22   operator of the boat and he conceded that he does not profess to recall every instruction provided.

23   Fact 62.  Foss drove the Vessel out of marina and before sending the Palla Group on its way, and

24   Garcia and Botwin had affirmed to Foss that they were comfortable operating the boat before

25   Foss left. Fact 63.  Per Lakeside Marina's procedures, Foss would not have released the Vessel

26   into the possession of the Palla Group had the Vessel's operators indicated that they were not

27   comfortable operating the Vessel.  Fact 64.

28

1

2        Although Botwin had operated the rental boat for a short amount of time, Garcia operated

3the Vessel for the majority of the time, and was operating the Vessel when Palla went tubing.

4Fact 65.  Between three to five members of the Palla Group went tubing prior to Palla's turn.

5Fact 66.  Ultimately, Palla decided to end her turn tubing because the water was cold.  Fact 67.

6To maneuver the Vessel to pick up Palla, Garcia had circled the Vessel around and positioned the

7Vessel's right or starboard side to come alongside Palla.  Fact 68.  While Palla waited behind the

8rental boat for a member of the Palla Group to drop the swim ladder, her legs were pulled

9beneath the boat and her right leg became lodged within the boat's propellers. Fact 69.  Prior to

10the incident (and hearing Palla scream), everyone had been laughing, joking and having a good

11time.  Fact 70.

12        There is recollection amongst members of the Palla Group of the rental boat having gone

13in reverse immediately prior to Palla's scream, and even Palla has discussed with other members

14of the Palla Group that the Vessel had to have been in reverse for the incident to have happened.

15Fact 71.  At deposition, Garcia appeared to be claiming that when Foss showed them the

16"neutral" throttle position on the Vessel, Foss referred to it as the "off" position; he also

17indicated that if he had been instructed to "completely close the boat," that would have meant

18something different than neutral to him.  Fact No. 72.  However, the investigating officer of one

19of the units which had responded to the incident scene, and who had transported Garcia back and

20had interviewed Garcia post-incident, reported, as well as has testified in this matter, that Garcia

21told him that he had been "operating the boat pulling [Palla] on the–on a tube, that she had gone

22in the water, and was done with her turn, that he put the –he said that he put the boat *in neutral*

23and waited for her to swim to the boat.  *And then he heard a yell or scream.  He shut the motor*

24*off and ran to the back of the boat to see what was going on.*  And then that's when he learned

25that [Palla] was stuck in the prop."  Fact 73. (Emphasis added).  Officer Skibinski further

26testified that the words in his report that the boat had been in "*neutral*" and Garcia's statement

27that "when he heard a cry, he immediately *turned the motor off,*" would have come directly from

28

1    his notes from interviewing Garcia and that he definitively remembered Garcia using those terms.

2    Fact 74. The impact of Palla's bone had caused the propeller damage documented by Deputy

3    Lovell, which damage had been sustained to the trailing edge of the Vessel's counter-rotating

4    propellers, indicating that the Vessel was in reverse at the time of the incident.  Fact 75.

5         The Vessel rented to members of Ms. Palla's group on July 24, 2016, did not and was

6    never intended to transport passengers between ports in the United States, nor between a port in

7    the United States and any port in a foreign country, but instead, departed from Lakeside Marina

8    located in South Lake Tahoe, to which same marina the Vessel was to be returned at the end of

9    the rental period by Ms. Palla's group.  The Vessel at all times relevant to this action, including

10   on July 24, 2016, had been rented exclusively for recreational purposes.  Fact 76 ( Hassett Decl.,

11   ¶ 4.)

12        All three appearing Third Party Defendants have admitted in their respective answers to

13   the Third-Party Complaint that there is an actual controversy as between them and Third Party

14   Plaintiffs.  Fact 77.

15   **II.    STANDARD OF REVIEW**

16        Summary judgment is appropriate when the supporting testimony and documents show

17   there is no genuine issue as to any material fact and that the moving party is entitled to judgment

18   as a matter of law. *Federal Rules of Civil Procedure*, Rule 56(c).

19        The moving party bears the burden of informing the court of the basis for its motion,

20   along with introducing evidence showing the absence of any genuine issue of material fact.

21   *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  As to those issues upon which it bears the

22   burden of proof, the moving party must make a showing sufficient for the court to hold that no

23   reasonable trier of fact could find other than for the moving party.  *Calderone v. United States,*

24   799 F.2d 254, 259 (6th Cir. 1986).  A "material fact" is a fact that might affect the outcome of the

25   suit under the governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A

26   dispute regarding a material fact is considered "genuine" if the evidence is such that a reasonable

27   jury could return a verdict for the nonmoving party.  *Liberty Lobby,* 477 U.S. at 248.

28

1

**III.** **AS A MATTER OF LAW, THIRD-PARTY PLAINTIFFS ARE ENTITLED TO**

2

**PARTIAL SUMMARY JUDGMENT ON THEIR EXPRESS CONTRACTUAL**

3

**INDEMNITY CAUSE OF ACTION**

4

**A.** **Applicable Law**

5

The incident occurred on the navigable waters of Lake Tahoe and involved boating - a

6

pursuit having a significant relationship to traditional maritime activity. *Cobb v. Aramark Sports*

7

*and Entertainment Services, LLC* , 933 F.Supp.2d 1295, 1298 (D.NV. 2013). Therefore, the

8

matter is within the Admiralty jurisdiction of this Court.   However, the Agreement provides that

9

"[a]ny disputes will be subject to and determined under the laws of California."  The Court is not

10

presented with a conflicts of law issue because the result, *i.e.*, that the Indemnity Agreement is

11

enforceable, is the same regardless of whether maritime law or California law is applied.

12

**B.** **The Indemnity Provision**

13

Third-Party Defendants Botwin, Roberts, Cascardden, O'Dea and Ozyurt each signed  as

14

a "lessee" the Agreement, which in enlarged, capitalized and bold print is also entitled

15

"RELEASE OF LIABILITY AND INDEMNITY AGREEMENT."  An Agreement "Participant"

16

is defined as a person who has voluntarily agreed to participate in activities offered by Lakeside.

17

"Activities" as defined in the Agreement, include,  among other things, "boat ...rental and use"

18

and "tubing."

19

The Agreement states: "I understand that MY PARTICIPATION IN THE ACTIVITIES

20

CAN BE HAZARDOUS AND POSE RISKS OF INJURY OR DEATH to me and/or my

21

property.  I further understand and acknowledge that ATTENDING, OBSERVING OR

22

MERELY BEING IN THE PROXIMITY OF THE ACTIVITIES, EQUIPMENT, OR

23

FACILITIES EXPOSES ME TO RISKS posed by conditions, individuals, equipment, or events

24

which have potential to cause death, serious injury, disability or property loss."  The lessee

25

signatories affirm that they have read and agree to the conditions of the Agreement.  On the front

26

side of the Agreement, there appears several lines above the lessees' signatures: 'THE LESSEE

27

HAS READ AND AGREES TO THE CONDITIONS PRINTED ON **BOTH SIDES** [enlarged

28

on the Agreement] OF THIS CONTRACT.'"

On the reverse side of the Agreement, the first paragraph warns that such "RISKS" are "INHERENT AND ARE TOO NUMEROUS TO LIST, BUT INCLUDE: ... operator error ... . The risk of injury due to a third party's inattention, carelessness, recklessness, or negligence while participating in the Activities is great - at all times I must be diligently aware of my surroundings." Objectively read, said language clearly warned of the potential risk of danger of sustaining injury from participation in the Activities caused by third parties consequences from which indemnity may be sought, as set forth further in the Agreement.

**Also on the reverse side, as consideration for being permitted to participate in the Activities and use the Equipment, each signatory agrees:**

**"I AGREE TO RELEASE FROM ANY LEGAL LIABILITY, AGREE NEVER TO SUE, AND AGREE TO DEFEND, INDEMNIFY AND HOLD HARMLESS, LAKESIDE [as defined on first page of Agreement as  LM SPORTS, INC., dba LAKESIDE MARINA, and dba ACTION WATERSPORTS, and LT LEASING, INC],** its owners, investors, officers, directors, lenders, managing agents, employees, managing agents, employees, agents, landowner, landlords, and all affiliated companies, .... for injury ... to ... third-parties resulting from my participation in the Activities, regardless** as LM SPORTS, INC.., dba LAKESIDE MARINA, and dba ACTION WATERSPORTS, and LT LEASING, INC **of the cause to the fullest extent allowed by law, including the alleged NEGLIGENCE of LAKESIDE."**

Per the explicit terms of the Indemnity Provision of the Agreement, the Hassetts, as officers of LM Sports and LT Leasing, would clearly also be entitled to partial summary judgment in their favor on the express contractual indemnity cause of action as well.

**C.     The Indemnity Agreement Is Valid and Enforceable under California as Well as Maritime Law**

California accepts the traditional definition of "indemnity": " ... the obligation resting on

1   one party to make good a loss or damage another party has incurred." *Rossmoor Sanitation , Inc.*
2   *v. Pylon, Inc.,* (1975) 13 Cal.3d 622, 628.  Express indemnity, as arising from express contractual
3   language that establishes a duty upon the part of one party to save another harmless upon the
4   occurrence of specified circumstances, is enforced "in accordance with the terms of the
5   contracting parties' agreement." *Markley v. Beagle,* (1967) 66 Cal.2d 951, 961.  The standard for
6   enforcement is that the language on point be "particularly clear and explicit, ... ." *Crawford v.*
7   *Weather Shield Mfg., Inc.* (2008) 44 Cal.3d 541, 552.  But wide latitude is allowed, for, given
8   clear and unambiguous language, the governing legal rules and restrictions do permit "great
9   freedom to allocate [indemnification] responsibilities as they see fit[,]" *Crawford* at 551, and "in
10   the establishment of the indemnity arrangements." *E.L. White, Inc. v. City of Huntington Beach,*
11   (1978) 21 Cal.3d 497, 507.

12          Maritime law yields the same result - indemnity agreements are enforced that may cover
13   all losses, damages, or liabilities that reasonably appear to be within the contemplation of the
14   parties. *Theriot  v. Bay Drilling Corp.,* 783 F.2d 527, 540 (5th Cir. 1986).  Further, the "duty to
15   indemnify [in a maritime case] will exist if the parties' intention for a particular indemnification
16   can be inferred from the language of a contract, even in the absence of an express provision."
17   *East  v. Premier, Inc.,* 98 Fed.Appx. 317, 320 (5th Cir. 2004).  The agreement is enforceable
18   where the contractual language at issue is "clear and unequivocal and clearly indicates the
19   intentions of the parties." *M/V AMERICAN QUEEN v. San Diego Marine Construction Corp.,*
20   708 F.2d 1483, 1488 (9th Cir. 1983).  Here again, restrictiveness is eschewed: "Even in maritime
21   law, we construe contracts by giving their terms their normal and every day meaning." *Sander v.*
22   *Alexander Richardson Investments*, 334 F.3d 712, 716 (8th Cir. 2003).

23          Under California as well as maritime law, indemnity agreements may be broad.  There
24   can be no real dispute over whether the indemnity language was appropriately and effectively
25   communicated to Botwin, Roberts, Carscadden, O'Dea and Ozyurt.  They signed the Agreement
26   and by doing so - in large, capitalized language only several lines above their signatures -
27   "READ AND AGREED" to "THE CONDITIONS PRINTED ON **BOTH SIDES** OF THIS
28

1 | CONTRACT."  By agreeing to this type of "read and agreed language," signatories explicitly

2 | acknowledge that certain obligations - the obligations to which they sign - would result from the

3 | signed agreement.  *Rubin v. Aggressor Fleet, Inc.,* 2009 WL 10679970 (E.D. La. 2009).  While

4 | this language would be intelligible an ordinary layperson, this language certainly would be

5 | intelligible to these very well-educated Third Party Defendants.

6 |       Botwin admits that he read and understood the Rental Contract he signed.  So, of course

7 | he is bound by its enforceable terms.  Though the other appearing Third-Party Defendants may

8 | not recall having read the Agreement, any failure on their part to have read it is unavailing as a

9 | defense to enforcement of its terms, given that they signed the Agreement:

10 |       A cardinal rule of contract law is that a party's failure to read a contract, or to

11 |       carefully read a contract, before signing it is no defense to the contract's

12 |       enforcement. [citations omitted].

13 | *Desert Outdoor Advertising v. Superior Court* (1st Dist. 2011) 196 Cal.App.4th 866, 872.

14 |       Per Hassett, by signing the Agreement, the participants acknowledge that they are

15 | responsible for their own actions, and are aware of th potential dangers inherent in water sports.

16 | This intent is manifest in the specific language of the first back-side paragraph : "THE RISKS ...

17 | ARE INHERENT AND ARE TOO NUMEROUS TO LIST"; however, "operator error," is set

18 | forth as one of the inherent risks.

19 |       Further, specifics of the legal obligations incurred by signing were unambiguously

20 | communicated.  By the fifth paragraph, in pertinent part, each signatory agrees "TO ...

21 | INDEMNIFY ..., LAKESIDE ... for injury ... to third-parties resulting from my participation in

22 | [boating and tubing], regardless of the cause to the fullest extent allowed by law, including the

23 | alleged NEGLIGENCE of LAKESIDE."   [R]egardless of the cause" is a deliberately inclusive

24 | phrase that modifies "participation," and so grammatically (and so, legally as well)

25 | establishes that participation need not be the legal or proximate cause of the injury - here, the

26 | injury to third-party participant Palla.  Any cause will suffice, provided only that the signatory

27 | was a participant in the boating/tubing venture.  Paul Garcia's failure to shut "off" the boat's

28 |

1   engine in the vicinity of Palla, who was in the water, would clearly be included as one of the

2   "RISKS" of which Third Party Defendants had been apprised by LAKESIDE.

3        The phrase in the indemnity provision of the Agreement "regardless of the cause" is to be

4   given its "normal and every day meaning." *Sander,* at 716. "[R]egardless of cause" is all-

5   inclusive and the phrase is to be applied inclusively.  To paraphrase the court in *Knott v.*

6   *McDonald's,* 147 F.3d 1065, 1067 (9th Cir. 1998), "in short, '[regardless of cause]' means

7   regardless of cause[,]" notwithstanding that the phrase embraces and is broad.  The *Knott* court,

8   acknowledging that "all" is admittedly broad, nonetheless recognized that "[i]n short, 'all' means

9   all." *Knott,* at 1067. "The law imposes no requirement that one who rents [out] equipment such

10  as a boat ... instruct the renter on every possible danger that could be faced." *Craine v. United*

11  *States,* 722 F.2d 1523, 1525 (11th Cir. 1984).

12       **D.    The Indemnity Provision Would Not Be Rendered Invalid By 46 U.S.C. §**

13            **30509**

14       During the meet and confer process, one of the parties raised as a defense to

15  enforcement of the indemnity provision the statutory language of 46 U.S.C. § 30509, which

16  provides:

17    (a) Prohibition.

18    (1)  In general. The owner, master, manager, or agent of a vessel transporting passengers

19       between ports in the United States, or between a port in the United States and a port in a

20       foreign country, may not include in a regulation or contract a provision limiting--

21    (A)  the liability of the owner, master, or agent for personal injury or death caused by the

22       negligence or fault of the owner or the owner's employees or agents; or

23    (B)  the right of a claimant for personal injury or death to a trial by court of competent

24       jurisdiction.

25    (2)  Voidness. A provision described in paragraph (1) is void.

26

27  This case does not involve a situation in which the Vessel's owner, manager or agent was

28

1   transporting passengers at the time of the incident.  Moreover, the Vessel was used only for

2   recreational purposes and was to be returned by the Palla Group to the same port, Lakeside

3   Marina.  Indeed, Foss pointed out various landmarks to Garcia and Botwin as they departed the

4   Lakeside Marina for them to look for when returning "back" to Lakeside Marina, returning to the

5   same departure point.

6          Further and notably, in *Johnson v. Royal Caribbean Cruises, Ltd.,* 449 Fed.Appx. 846

7   (11th Cir, 2011), in which case a liability waiver properly was disallowed under §30509 as the

8   vessel in fact was transporting passengers "between" ports.  The court found the language of

9   section 30509 "clear and unambiguous" and so applied "the first rule in statutory construction" -

10  where the language and meaning is "plain and unambiguous, ... there is no need for further

11  inquiry."  Id.at 848.  By limiting Sections 183c and 30509 to voyages "between ports," and not to

12  local "out and back" trips, the court's recognition that Congress "saw fit to avoid liability

13  waivers in one situation and not in the other is clearly apparent and makes any comparison of the

14  two irrelevant[.]"  As further noted in *Charnis v. Watersport Pro, LLC,* 2009 WL 2581699, 2009

15  A.M.C. 1299, 1305 (D.Nv. 2009), the statutory provision "on its terms ... is limited solely to

16  'vessel[s] transporting passengers between ports'."

17  **IV.     THIRD-PARTY PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY**

18  **         JUDGMENT ON THEIR NEGLIGENCE/ INDEMNITY CAUSE OF ACTION**

19         Here again California and maritime law march to the same drum-beat in allowing

20  equitable indemnity.

21         California applies equitable indemnity as "an equitable apportionment of loss based on

22  the relative responsibility of the parties - ... ."  *Bay Development, Ltd. v. Superior Court* (1990)

23  50 Cal.3d 1012, 1029-30 n. 10.  The equities of  "the particular case" provide the framework for

24  the apportionment.  *E.L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 507.

25         Additionally, *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411 (1975), holds

26  that maritime tort liability "is to be allocated among the parties proportionately to the

27  comparative degree of their fault."  Earlier, in *Compania Anonima Venezolana de Navagacion v.*

28

1   *A.J. Perez Export Co.,* 303 F.2d 692, 699 (5th Cir. 1962), there was recognition that a federal

2   judge hearing an admiralty case dispenses "that which equity and good conscience impels."

3        The equities in this case dictate equitable indemnification of Third Party Plaintiffs by

4   Third Party Defendants.  The use of the Vessel for boating and tubing by the Palla Group was

5   prompted by Third Party Defendants' rental and use of the Vessel, as a result of which rental

6   Third Party Plaintiffs now find themselves embroiled in litigation for Ms. Palla's injuries.

7   Moreover, Third Party Plaintiffs are being sued as a result of Third Party Defendant's designated

8   operator's failure to follow instructions clearly provided to all of Lakeside's boat rental

9   customers intending to engage in towing sports.

10        Lakeside educated the drivers who rented their boats and reasonably expected the drivers

11   to accept responsibility for safely driving the boat and looking out for the safety of their tubers.

12   Lakeside did all that Lakeside reasonably could do, given that only the participants, as opposed to

13   anyone from Lakeside, were on the rental boat at the time of the incident.

14   **V.   DECLARATORY RELIEF SHOULD BE ENTERED IN FAVOR OF THIRD-**

15        **PARTY PLAINTIFFS AGAINST THIRD-PARTY DEFENDANTS**

16        Third-Party Plaintiffs have sought declaratory relief against Third-Party Defendants by

17   means of a Third-Party Complaint.  Third-Party Defendants have admitted that there exists a

18   controversy between them individually and Third-Party Plaintiffs.

19        As set forth above, O'Dea, Carscadden and Roberts executed a boat Rental Agreement

20   obligating each of them to indemnify Third-Party Plaintiffs for injury to Palla resulting from their

21   participation in the tubing venture, *regardless of the cause.*

22        Judgment for declaratory relief will serve the useful purpose of clarifying and settling the

23   legal relations between Third-Party Plaintiffs and Third-Party Defendants.  *Guerra v. Sutton,* 783

24   F. 2d 1371, 1376 (9th Cir, 1986).  In the absence of a genuine issue of material fact, declaratory

25   summary judgment is appropriate without trial.  *Kam-Ko Bio-Pharm Trading Co. v. Mayne*, 560

26   F.3d  935, 945 (9th Cir. 2009).

27   **VI.   CONCLUSION**

28

1       Third Party Defendants executed a clear, valid and enforceable indemnification

2   agreement in favor of Third Party Plaintiffs, the latter of which are entitled to be indemnified in

3   these matters on both contractual and equitable bases.  Declaratory relief is also appropriate in

4   these circumstances.  Third Party Defendants respectfully request the Court grant partial

5   summary judgment in their favor as set forth herein.

6

    Dated: June 11, 2018                    COGSWELL NAKAZAWA & CHANG, LLP
7

8                                       By:    /s/ Dena S. Aghabeg
                                          Dena S. Aghabeg

9                                           Attorneys for Attorneys for Plaintiffs-in-Limitation,
                                        Defendants, Cross-Claimants Third Party Plaintiffs

10                                          and Third Party Defendants-in-Counterclaim LT
                                        LEASING, INC.; LM SPORTS, INC. dba

11                                          LAKESIDE MARINA and dba ACTION
                                        WATERSPORTS (erroneously sued as dba

12                                          ACTION WATERSPORTS OF TAHOE) and
                                        Plaintiffs-in-Limitation, Cross-Claimants, Third

13                                          Party Plaintiffs and Third Party Defendants-in-
                                        Counterclaim LM SPORTS, INC. dba ACTION

14                                          WATERSPORTS OF LAKE TAHOE and dba
                                        ACTION WATERSPORTS AT LAKE TAHOE;

15                                          TAMARA HASSETT, individually, and ROBERT
                                        HASSETT, individually

16

17

18

19

20

21

22

23

24

25

26

27

28