Manisha Palla,

        Plaintiff,

    v.

L M SPORTS, INC. dba LAKESIDE
MARINA and dba ACTION
WATERSPORTS OF TAHOE; L T
LEASING, INC.; PAUL GARCIA;
and DOES 1-50, inclusive,

        Defendants.

_____

AND RELATED ACTIONS.

No. 2:16-cv-02865-JAM-EFB

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

## I. BACKGROUND AND PROCEDURAL HISTORY

Manisha Palla ("Plaintiff") sued Defendants L M Sports, L T
Leasing, and Paul Garcia for negligence following an accident on
Lake Tahoe that resulted in the amputation of her right leg. L M
Sports and L T Leasing (collectively "Defendants") filed a
limitation of liability action under 46 U.S.C. §§ 30505 et seq.
The Court related the two actions. See Related Case Order, ECF

No. 12.  Garcia made an initial appearance and participated in

the suit through June 2018.  Following the withdrawal of Garcia's

attorney that month, ECF No. 72, Garcia did not make any other

appearances until he showed up to testify during the limitation

action on March 4, 2019.  Neither party has attempted to enter a

default against Garcia.

Palla invoked the Court's diversity jurisdiction as well as

its admiralty jurisdiction.  First Am. Compl. ("FAC") ¶¶ 2-4.

Defendants' limitation action also invoked the court's admiralty

jurisdiction.  The Court decided to first hold a bench trial on

Defendants' limitation action and allow Palla a jury trial on the

issue of damages if she made a showing of negligence during the

limitation action.  Palla v. L M Sports, No. 2:16-cv-02975-JAM-

EFB, 2019 WL 427300 (E.D. Cal. Feb. 4, 2019).

The Court held a ten-day bench trial beginning February 25,

2019.  The parties offered in-person and deposition testimony

from the marina owner, marina employees, two first responders,

four experts[1], and the thirteen (13) people who were on the boat

at the time of the accident, including Palla and Garcia.  The

parties did not stipulate to any facts before or during trial.

---

[1] The Court found that one of Defendants' witnesses, Douglas
Powell, "barely" qualified as a standard-of-care expert and
admitted his testimony with "great concern."  Powell's report was
based on three (3) months' experience of working as an expert.
In those three months, Powell allegedly reviewed the policies of
three (3) marinas.  At trial, he could not name any of them.  He
testified that, based on his expertise, boating passengers need
not "understand dangers that are likely to lead to catastrophic
injury," and contradicted otherwise uncontroverted evidence.  The
Court found Powell's testimony to be wholly incredible, and
therefore disregards it in its entirety.

## II.  FINDINGS OF FACT

1.  L M Sports is a California corporation that does business as Lakeside Marina.

2.  Lakeside Marina is one of four marinas Bob and Tamara Hasset own and operate on Lake Tahoe.

3.  The Hassets' other marinas are Timber Cove Marina, Round Hill Pines Marina, and Camp Richardson.

4.  At the time of the incident, the Hassets also owned and operated Meeks Bay Marina.

5.  In 2016, the Hassets owned 54-57 boats across five (5) marinas.

6.  In 2016, the Hassets had 12-15 boats, eight (8) personal watercrafts, and 18-25 employees at Lakeside Marina.

7.  The Hassets also own L T Leasing, Inc., a California corporation they have used to lease boats to their marinas since 1992.

8.  Robert Hasset is the President of L M Sports and the Chief Financial Officer of L T Leasing, Inc.

9.  Tamara Hasset is the President of L T Leasing and the Chief Financial Officer of L M Sports.

10.  The Hassets decide which boats will be purchased and the activities for which they will be used.

11.  As President of L M sports, Robert Hasset (hereinafter "Hasset") sets forth the policies and procedures of Lakeside Marina.

12.  He hires general managers at each marina to train employees and supervise operations.

13.  During the summer of 2016, Dan Meeks was the general

manager at Lakeside Marina.

14.  As part of his general manager duties, Meeks conducted monthly safety meetings for the Lakeside Marina staff.

15.  Hasset did not provide Meeks with written descriptions of his job responsibilities or instruct him to keep written records on the marina's employees.

16.  Hasset did not require Meeks to document what was discussed at the safety meetings he conducted.

17.  In July 2016, Manisha Palla, Evan Botwin, Nick Carscadden, Frances Copeland, Paul Garcia, Benoit Gautier, Alvaro Herranz, Elena Legramanti, Erlinda Lesi, Sean O'Dea, Efe Özyurt, Regan Roberts, and Christa Wolf ("the Palla group") were in Dublin, CA as part of an international training rotation with their employer, System Application Products ("SAP").

18.  Members of the Palla group came from different SAP offices around the world, so they did not know each other prior to the Dublin training.

19.  Palla worked in the Chicago, Illinois office.

20.  Garcia worked in the Paris, France office.

21.  Botwin worked in the Philadelphia, Pennsylvania office.

22.  Botwin used Lakeside Marina's online reservation system to reserve a boat and an innertube for Sunday, July 24, 2016.

23.  Botwin selected the 1997 Four Winns because it had the highest maximum capacity.

24.  The Palla group drove to Lakeside Marina in separate cars—the car with Botwin, Carscadden, O'Dea, Özyurt, and Roberts arrived at Lakeside Marina first.

25.  Botwin, Carscadden, O'Dea, Özyurt, and Roberts went

into the rental hut to check-in for the reservation.

26. On July 24, 2016, Julie Hontos was the only employee working in the rental hut.

27. Hontos did not provide any information about the type of boat Botwin reserved or what type of propulsion system it had; nor was she trained to.

28. Hontos gave Botwin, Carscadden, O'Dea, Özyurt, and Roberts a map of the lake, and told them to avoid the shallow areas.

29. Hontos also gave them two forms—one was a rental agreement that included a release of liability and the other was a list of rules and regulations.

30. Botwin, Carscadden, O'Dea, Özyurt, and Roberts signed the rental agreement.

31. The rules and regulations sheet only had one space for a signature; Botwin signed it.

32. Neither form included specific tubing instructions or contained specific warnings about the dangers of propeller strikes.

33. Hontos did not tell Botwin that the eight (8) other people listed on the reservation were required to sign the rules or the rental agreement.

34. Neither of the two forms Hontos gave Botwin said that everyone on the reservation had to sign them.

35. Prior to July 24, 2016, Lakeside Marina did not provide its rental hut staff a written protocol for how to get renters to sign the rental contract.

36. When Botwin, Carscadden, O'Dea, Özyurt, and Roberts

were inside, the other eight (8) members of the group arrived.

37.  The new arrivals congregated around the picnic tables outside the rental hut until the other five (5) came outside.

38.  Nobody at Lakeside Marina instructed the group that they were all supposed to go inside the rental hut.

39.  Lakeside Marina did not have any signs that instructed all members of a reservation to go inside to sign forms.

40.  Soon after Botwin, Carscadden, O'Dea, Özyurt, and Roberts came back outside, Mathan Foss met the Palla group near the picnic tables and led them toward the dock.

41.  Foss was the dockhand in charge of boarding the Palla group onto the boat.

42.  Dan Meeks hired and trained Foss to work as a dockhand for the Summer 2014 boating season.

43.  All of Lakeside Marina's dockhand training was done orally, without aid of any written documents.

44.  Foss's training included shadowing other dockhands; being shadowed by Lakeside supervisors as he carried out dockhand responsibilities; and learning how to launch boats and check for invasive species.

45.  At the end of his training, Foss had to take a computerized test on how to properly check for invasive species before launching boats.

46.  Foss did not, however, take any written tests on how to properly give safety instructions to renters; nor was he ever given any written instructions on how to properly give safety instructions.

47.  As the dockhand assigned to the Palla group on July 24,

2016, Foss gave instructions on how to operate the rental boat to the boat operators, Garcia and Botwin.  The instructions were known as the "spiel."

48.  Foss also drove the rental boat out of the marina for the Palla group.

49.  Per Hasset's instructions, Meeks trained Foss that dockhands only needed to provide boating information to the operator(s) of the rental boat.

50.  Meeks trained Foss to identify the operator(s) and ask whether the operator(s) had any boating experience.

51.  Meeks trained Foss to show the operator(s) the boat, pointing out the propellers, fire extinguisher, ski flag, oar, life jackets, throw cushion/flotation device, kill cord, throttle, blower, steering wheel, and the marina's phone number (located on the back of the rental contract).

52.  Meeks trained Foss to tell the operator(s) how to pick up tubers: circle the boat around so that the tuber is on the driver's side, shut the boat off, and let the tuber swim to the boat, using the ladder to board.

53.  Meeks trained Foss to instruct the operator(s) how to click the lever at the bottom of the throttle to move it forward, backward, and into neutral.

54.  Meeks trained Foss to explain to the operator(s) that they would be financially responsible for any damage caused to the propeller.

55.  Meeks did not train Foss to discuss the dangers of propeller strikes with the operator(s).

56.  Meeks did not train Foss to show the operator(s) the

proximity of the propellers to the boarding ladder.

57. Meeks did not train Foss to ensure the operator(s) relayed the safety instructions to the boat passengers.

58. Meeks did not train Foss to ask tubing passengers whether they had any experience tubing.

59. Meeks did not train Foss to give any safety instructions to customers who would be tubing.

60. Meeks trained Foss to drive the rented boat out of the marina for rental groups so the operator(s) did not damage any of the boats in the marina.

61. Foss completed his first period of employment with Lakeside Marina at the end of the Summer 2014 boating season.

62. Meeks re-hired Foss to work as a dockhand for Lakeside Marina two summers later.

63. Foss did not receive new training when he came back to work for Lakeside in 2016.

64. On July 24, 2016, Foss identified the operators of the Palla group's rental boat: Botwin and Garcia.

65. Botwin and Garcia joined Foss on the dock, while the other members of the group lined up single-file along a narrow dock ramp.

66. Botwin told Foss he did not have any experience driving boats.

67. Garcia told Foss he'd driven boats before and that his family owned a boat in France.

68. Foss maintained Botwin and Garcia's attention, but he did not know whether any of the passengers on the ramp were listening.

69.   Foss never spoke to the Palla group as a whole.

70.   None of Foss's supervisors were watching him as he gave his spiel to the Palla group.

71.   Foss showed Garcia and Botwin the propellers, fire extinguisher, ski flag, oar, life jackets, throw cushion/flotation device, kill cord, throttle, blower, steering wheel, and the marina's phone number.

72.   Foss told Garcia and Botwin that centering the throttle put the boat in neutral, turning the key turned the boat off, and that the operators must turn the boat off when people are boarding.

73.   Foss showed Botwin and Garcia the boat's propellers, but only for the purpose of informing them that they would be responsible for any additional damage.

74.   Foss did not specifically address any of the passengers during the spiel.  He did not point out the location of the propellers to the passengers.  He did not pull out the ladder, point out the proximity of the ladder to the propellers, or provide any of the passengers with tubing-specific safety instructions (i.e., how to safely get in and out of the boat).

75.   After Foss gave his spiel, the Palla group boarded their rental boat—a 1997 Four Winns ("the Four Winns").

76.   The Hassets purchased the Four Winns in 2006.

77.   The Four Winns was an inboard/outboard boat ("I/O boat") with counter-rotating propellers, and the only boat at Lakeside large enough to fit a party of 13 people.

78.   The Four Winns had a fold-in ladder on the back under a small door.

79. Once unfolded, the ladder sat 17 inches away from the propellers.

80. The propellers moved closer to and further from the ladder depending on how the steering wheel was turned.

81. Hasset and Meeks knew how close the ladder was to the boat's counter-rotating propellers, and that L M Sports rented this boat out for towing sports.

82. The Palla group did not bring any alcohol or drugs onto the boat.

83. After Foss drove the Palla group out onto the lake, he got onto a skiff, and went back to the marina.

84. The water on the lake was cold and choppy.

85. Botwin and Garcia both drove the boat for a while without pulling any tubers.

86. None of the passengers felt uncomfortable with the way Botwin and Garcia were driving the boat.

87. Garcia was the only person who drove the rental boat once the group started tubing.

88. At least three members of the Palla group went tubing before Palla.

89. Neither Copeland nor Gautier saw the propeller when re-boarding the boat after they went tubing; O'Dea did.

90. Neither Copeland, Gautier, nor O'Dea communicated that they had any problems getting back onto the boat after they went tubing.

91. Palla was last person to go tubing.

92. After Palla fell off the tube, Garcia circled the boat around to pick her up.

93. Palla swam toward the back of the boat where the group encouraged her to take another turn.

94. Palla got back on the tube and took another turn.

95. Palla fell off the tube again.

96. After Garcia circled around to pick up Palla, he attempted to put the boat in neutral.

97. Before Garcia "clicked" the throttle into the neutral position, the preponderance of the evidence suggests that he inadvertently pulled it through neutral and into reverse.

98. Palla swam toward the back of the boat where a member of the group lowered the ladder

99. As Palla reached toward the boarding ladder, she was pulled down by the chop of the water.

100. Palla's legs were then swept into the still-spinning propeller blades.

101. Palla freed her left leg, but her right leg became wedged in between the two propeller blades.

102. Upon hearing Palla's screams, Garcia and Herranz went to the back of the boat.

103. Garcia leaned over the back to hold Palla out of the water, while Herranz held onto Garcia's legs.

104. Other members of the group jumped into the water to help Palla, while Copeland and Botwin called 9-1-1 and Lakeside Marina.

105. Lt. Leslie Lovell, a sheriff and member of El Dorado County's summer boat patrol, was one of the first responders.

106. Deputy Aaron Crawford, who worked for the Douglas County Sheriff's Department, also arrived shortly after the

accident.

107. Lt. Lovell and Deputy Crawford eventually freed Palla's leg from the propeller blades.

108. Marine One transferred Palla to Timber Cove, where she was airlifted to a nearby hospital.

109. Due to the injuries Palla sustained, doctors had to amputate her right leg above the knee.

110. After Palla was air-lifted from Timber Cove, Lt. Lovells conducted an inspection of the rental boat.

111. Lt. Lovells did not find any problems with the boat's operation.

112. Lt. Lovells concluded that, based on the damage he found on trailing edge of the propeller blades, the boat was in idle reverse at the time of the accident. The Court agrees with this conclusion.

### III.   OPINION

#### A.   Legal Standard

The Limitation of Liability Act ("LOLA") provides shipowners with an opportunity to cap the amount of damages owed to a claimant or group of claimants.  See 46 U.S.C. § 30505 et seq.  After the shipowner files a limitation of liability petition, the limitation action proceeds in two phases.  First, the injured party must show "what acts of negligence or conditions of unseaworthiness caused the accident."  In re Hechinger, 802 F.2d 202, 207 (9th Cir. 1989).  If the claimant fails to make a showing of negligence or unseaworthiness, the vessel owner is wholly exonerated—"if no liability exists there

is nothing to limit." Id. (quoting Northern Fishing Trading Co., Inc. v. Grabowski, 1973 A.M.C. 1283, 1290 (9th Cir. 1973)).

But if the claimant makes a valid showing of negligence or unseaworthiness, the action proceeds to the second phase. At this stage, the burden shifts, requiring the shipowner to prove that "the act or condition [causing the accident] was outside its privity or knowledge." In re BOWFIN M/V, 339 F.3d 1137, 1137 (9th Cir. 2003). If a vessel owner makes this showing, his liability is limited to the value of the vessel and its cargo. Newton v. Shipman, 718 F.2d 959, 961 (9th Cir. 1983).

B.   Analysis

1.   Choice of Law

Defendants' limitation action arises out of the Court's admiralty jurisdiction and is governed by federal admiralty law. Churchill v. F/V Fjord, 5 F.3d 374, 376 (9th Cir. 1993). A court may use state law to supplement federal admiralty law, but only when the state's law "will not work material prejudice to the characteristic features of the general maritime law, nor interfere with the proper harmony and uniformity of that law." Id. at 207 (quoting Western Fuel Co. v. Garcia, 257 U.S. 233, 242 (1921)).

2.   Negligence

Palla proved by a preponderance of the evidence that L M Sports was negligent. A negligence claim under admiralty law has the same elements as a common law negligence claim: duty, breach, causation, and damages. Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1070 (9th Cir. 2001). The Court finds that Defendant L M Sports negligently maintained a policy of allowing

its customers to go tubing without warning prospective tubers about propeller strikes.  The Court finds that Palla did not, however, prove that Defendant L T Leasing was negligent.

a.   The Oregon Rule, The Pennsylvania Rule, and Res Ipsa Loquitur

As a preliminary matter, Defendants argued that The Oregon Rule, The Pennsylvania Rule, and the doctrine of res ipsa loquitur each preclude a finding of negligence against Defendants.  The Court rejects this argument.   As discussed below, each of these doctrines are ill-fitted for the facts of this case.  Furthermore, these doctrines—even when applicable— merely create a presumption that the vessel operator was a cause of the accident; not the sole cause.  See Crowley Marine Services Inc. v. Maritrans Inc., 2006 A.M.C. 1246, 1254 (9th Cir. 2006) ("Our analysis of the applicability of the COLREGS does not, of course, determine the ultimate allocation of liability in this case."); Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC, 438 F.Supp. 1174, 1182 (E.D. Cal. 2006) ("[E]ven if [the vessel operator's] negligence is established, the question of comparative negligence remains.").  Defendants cannot use The Oregon rule, The Pennsylvania rule, or res ipsa loquitur to absolve themselves of liability.

By its own terms, The Oregon rule does not apply.  The Oregon Rule creates a presumption that the operator of a vessel is at fault when the vessel collides with a stationary object.  The Oregon, 158 U.S. 186, 192-93 (1895).  This presumption flows from "the common-sense observation that moving vessels do not usually [a]llide with stationary objects unless the vessel is

mishandled in some way." <u>City of Chi. v. M/V Morgan</u>, 375 F.3d 563, 572 (7th Cir. 2004) (quoting <u>Wardell v. Nat'l Transp. Safety Bd.</u>, 884 F.2d 510, 512 (9th Cir. 1989)).  Defendants do not cite to any cases that have classified human beings as "stationary objects."  Such a classification defies logic and is inconsistent with the rationale underlying the presumption.

Likewise, <u>The Pennsylvania</u> Rule does not apply to the facts of this case.  Under <u>The Pennsylvania</u> Rule, when "a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions" the operator of the infringing vessel is presumed to be a contributing, if not the sole, cause.  <u>The Pennsylvania</u>, 86 U.S. 125, 136 (1873), <u>overruled on other grounds by United States v. Reliable Transfer Co.</u>, 431 U.S. 397, 411 (1975).  The presumption may only be rebutted where the vessel operator "shows by clear and convincing evidence that the violation could not reasonably be held to have been a proximate cause of the injury." <u>MacDonald v. Kahikolu, Ltd.</u>, 2009 A.M.C. 2113, 2118 (9th Cir. 2009) (citing <u>Trinidad Corp. v. S.S. Keiyoh Maru</u>, 845 F.2d 818, 845 (9th Cir. 1988)).  <u>The Pennsylvania</u> Rule applies to violations of the Inland Rules of Navigation.  <u>See Caravel/Woodwind Charters</u>, 438 F. Supp. 2d at 1182.

The Ninth Circuit has not defined the precise scope of <u>The Pennsylvania</u> Rule.  <u>MacDonald</u>, 2009 A.M.C. at 2118.  ("[I]t is not clear that <u>The Pennsylvania</u> Rule applies to cases that do not involve a collision or other "navigational accident.")  It has extended <u>The Pennsylvania</u> Rule to cover "navigational accidents" as well as collisions.  <u>Id.</u>  But it has not joined the ranks of other federal circuit courts that have pushed the

15

1  doctrine beyond these two categories. See id. at 2120-21

2  (collecting cases). Contrary to Defendants' argument, this

3  accident was not the result of a collision or "navigational

4  accident" in the ordinary sense of either term. This Court

5  declines to expand the scope of The Pennsylvania Rule where the

6  Ninth Circuit has not yet done so.

7       Finally, the Court finds that the doctrine of res ipsa

8  loquitur does not apply. Res ipsa loquitur "is a form of

9  circumstantial evidence that permits an inference of negligence

10 to be drawn from a set of proven facts." Ashland v. Ling-Temco-

11 Vought, Inc., 711 F.2d 1431, 1437 (9th Cir. 1983). This

12 doctrine is available in admiralty. Id. (citing Wilson v.

13 United States, 645 F.2d 728 (9th Cir. 1981).

14      To invoke res ipsa loquitur, a party must show: (1) an

15 injury-producing event of a kind that ordinarily does not occur

16 in the absence of someone's negligence; (2) the event was caused

17 by an agency or instrumentality within the exclusive control of

18 the defendant; and (3) the event was not due to any voluntary

19 action or contribution on the part of the plaintiff. Id. As

20 the elements suggest, res ipsa loquitur is traditionally used by

21 plaintiffs to create an inference of negligence where direct

22 evidence is lacking. Defendants here have not cited to any

23 cases where a party used res ipsa loquitur to defend itself

24 against a claim of negligence or shift liability to a co-

25 defendant. Nor is the Court aware of such authority.

26 Accordingly, the Court finds that res ipsa loquitur does not

27 apply.

28 ///

1                        b.    Duty of Care and Breach

Defendant L M Sports breached the duty of care it owed to Palla by failing to provide safety instructions to her (and other prospective tubers) before allowing them to take the rental boat out onto Lake Tahoe.  It is well-established that federal admiralty law imposes upon a shipowner "the duty of exercising reasonable care under the circumstances." <u>Kermarec v. Compagnie Generale Transatlantique</u>, 358 U.S. 625, 630 (1959). This duty is owed to seamen and all others aboard a boat "for purposes not inimical to [the vessel owner's] legitimate interests." <u>Id.</u>; <u>Ghotra by Ghotra v. Bandila Shippping, Inc.</u>, 113 F.3d 1050, 1060 (9th Cir. 1997).

The contours of this standard of care, "although not precisely defin[ed]," are "fashioned by the federal courts, by Congressional enactments, and[] by international conventions and treaties." <u>Prince v. Thomas</u>, 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997).  It is also informed by the Coast Guard's Inland Rules of Navigation; local custom and practice; and a general understanding of prudent maritime conduct. <u>Id.</u> "Reasonable care" in admiralty is neither more nor less stringent than the reasonableness standard for a common law negligence claim. <u>Weyerhaeuser Co. v. Atropos Island</u>, 777 F.2d 1344, 1348 (9th Cir. 1985).

The Court first finds that neither L M Sports nor L T Leasing breached a duty of care by simply making the Four Winns available to Lakeside Marina customers for tubing.  Palla argued that Defendants were negligent for failing to provide the Palla group a vessel fit for its intended purpose.  Palla did not,

however, prove by a preponderance of the evidence that the Four Winns manufacturer did not intend for the boat to be used for towing sports.  Nor did Palla present any evidence that the Four Winns was subject to recall.

Plaintiff's expert, William Kitzes, provided testimony that the warning labels on the rental boat were inconsistent with the 2016 American National Standard Institute ("ANSI"), American Boating & Yacht Council ("ABYC"), and National Association of State Law Administrators ("NASBLA") standards for warning labels.  But he did not testify that the warnings had been recalled or that Four Winns had advised its customers that the labels were inadequate.  Nor did he conduct a study of other marinas in Lake Tahoe to determine whether ANSI, ABYC, or NASBLA compliance is standard practice.

The Court recognizes that the design of the 1997 Four Winns made use of the boat's ladder dangerous.  But leasing companies and marinas are not responsible for a boat's design.  Absent a showing that the Four Winns was not intended for towing sports, or that either the boat or its warning labels were subject to recall at the time of the accident, the Court does not find Defendants breached a duty of care by making the Four Winns available to its customers for towing sports.

The Court does, however, find Defendant L M Sports had a duty to warn the entire Palla group of the dangers of propeller strikes both in general and when being towed behind the 1997 Four Winns.  L M Sports owed a reasonable duty of care under the circumstances to its renters at Lakeside Marina, including Palla.  By its own terms, this standard of care requires the

Court to consider all attendant circumstances when determining what is reasonable.  The circumstances here involved: (1) L M Sports's awareness that they largely serviced inexperienced boaters; (2) a large alpine lake; (3) a boat with its boarding ladder only 17 inches from its propellers; and (4) L M Sport's decision not to retrofit its boats with propeller safety devices.  Given these circumstances, the Court finds Defendant L M Sports had a duty to provide safety instructions to all of its tubing customers.  L M Sports breached this duty when it failed to give safety instructions to the whole Palla group.

In 2016, California state law allowed people to operate recreational boats without a boating license or any type of boating experience.  Consistent with state law, Lakeside Marina did not require its customers to have a boating license or any boating experience to rent one of its boats.  Both Meeks and Hasset confirmed this, testifying in court that the decision of whether to rent someone a boat lied almost entirely within Meeks's discretion.  Although later qualified by Hasset, Meeks testified that he only turned away potential customers if they were too intoxicated to operate a boat or be out on the lake. Meeks explained that a customer without boating experience might be required to take lessons with a marina employee prior to operating the boat by herself.  But a lack of boating experience did not disqualify anyone from renting a boat, operating a boat, or being towed behind a boat under either California law or Lakeside Marina policy.

The dangers of renting out boats without regard to operator or passenger experience increase when viewed in conjunction with

the size and elevation of Lake Tahoe.  Lake Tahoe is an alpine
lake.  Both Hasset and Lt. Lovells testified that the size and
elevation of Lake Tahoe make it a "unique body of water," giving
rise to circumstances not generally seen on other lakes.  The
weather changes quickly, the water can be unsettlingly cold, and
the current can cause the water to have several feet of chop—
enough to move a propeller's blades even when the boat is no
longer under power.  The peculiarities of Lake Tahoe raise
unexpected challenges for renters who, based on other
experiences, might expect to be familiar with water sports.
Those peculiarities pose even greater dangers for renters
without any experience at all.

But of perhaps paramount importance are the layout of the
1997 Four Winns and L M Sports's decision not to modify it
before renting it out for tow sports.  This is not a products
liability case.  All the same, a boat's features and a marina's
precautionary measures are both relevant considerations that
inform the scope of L M Sports's duty.  The boat L M Sports
rented to the Palla group had two counter-rotating propellers
that were capable of spinning up to a thousand times per second.
The propellers sat below the water line, 17 inches away from the
boarding ladder.  Hasset testified that, absent significant
upper body strength, a tuber would be unable to re-board this
particular boat without using the boarding ladder.

Defendants' Trial Exhibit C showed that the propellers were
not visible to people standing on the dock.  Although O'Dea
credibly testified at his deposition that he could see the
propellers as he re-boarded the Four Winns after tubing,

Copeland and Gautier both credibly testified that they did not see the propellers when re-boarding. At best, the propellers were only sometimes visible to tubers returning to the boat in choppy water. Even so, L M Sports did nothing to guard against the risk invariably posed by having the boat's boarding ladder so close to the propellers.

Plaintiff's expert, Dr. Alison Osinski testified that L M Sports could have retrofitted the Four Winns with safety equipment such as a ladder interlock device or a propeller guard. Although defense expert, Dr. Wendy Sanders, disagreed with Dr. Osinski about whether the industry required these devices, she acknowledged that a ladder interlock device would have prevented this accident so long as the ladder was down and no one intentionally overrode the system. Defendants chose not to install this device on the rental boat, as they were entitled to do. And safety hazards notwithstanding, L M Sports rented out the 1997 Four Winns out for towing sports.

But under these circumstances, reasonable care required L M Sports to inform all potential tubers of the risks they were likely to encounter. It is undisputed that Foss did not do this at any time during the "spiel." As discussed above, the Court rejects Palla's arguments that maritime law imposed a specific duty on Defendants to retrofit the rental boat with propeller-safety devices or modify the boat's warning labels absent a specific recall or regulatory requirement. The fact that Defendants could have taken greater strides to ensure their customers' safety with aftermarket devices does not make it required by law. Holzhauer v. Golden Gate Bridge Highway &

Transportation District ("Holzhauer I"), 899 F.3d 844, 850 (9th Cir. 2018) ("Even if having radar reflectors is a good practice, good practice does not create liability absent facts to support that the practice is an operational standard in the relevant community of small boat owners."). But it contravenes general understandings of prudent maritime conduct to rent out a boat that is uniquely dangerous for a particular purpose without warning the renters of those dangers—particularly given the severity of the risks involved and the feasibility of the remedial measure here. Indeed, Hasset himself testified that he believed passengers on a boat should be educated about propeller safety.

L M Sports was in the best position to know of the unique dangers posed by the rental boat when used for towing sports. L M Sports leased the boat. L M Sports decided where to put the boat and what it could be used for. L M Sports, unlike their customers, had occasion to see the rental boat when it was out of the water, with the ladder unfolded. And yet, it adopted a policy of not specifically warning prospective tubers about the dangers of propeller strikes. L M Sports did not require tubers to sign any type of written form that included tuber-safety information. It did not place any signs around Lakeside Marina warning prospective tubers of propeller strikes. And L M Sports did not train Foss to inform tubers of the risks that propellers pose generally or of the heightened risk propellers pose on the 1997 Four Winns.

On the next-to-last day of trial, Hasset testified for the first time that Foss was trained to tell a boat's operators that

they were tasked with relaying safety instructions from Foss to the other passengers.  The Court gave little if any weight to this testimony given that Hasset had testified for nearly two days at the beginning of the trial without ever mentioning this policy.  Neither Meeks nor Foss corroborated Hassett's testimony, i.e. that dockhands were trained to tell operators to relay information to other members of the boat.  And neither Botwin nor Garcia testified to hearing such an instruction.  Simply put, the Court did not find Hasset's amended account of Foss's training to be credible.  L M Sports breached its duty of care by failing to warn its customers of the dangers they were likely to encounter while tubing.

L M Sports argues that it should be absolved of any duty it owed Palla for two reasons: (1) Palla assumed the risk of being injured while tubing, and (2) the dangers posed by the rental boat's propellers were "open and obvious."  The Court rejects both arguments.

During trial, the Court requested briefing on the issue of the applicability of assumption of risk in this case.  See Plf.'s Trial Brief, ECF No. 256; Defs.' Trial Brief, ECF No. 257.  The Court issued an order from the bench on Friday, March 8, 2019 finding that assumption of risk did not apply as a bar to Palla's recovery here.  See Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 431 (1939).  That ruling stands.  In Socony-Vacuum Oil Co., the Supreme Court plainly stated:

> Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it.  Under that doctrine contributory

negligence, however gross, is not a bar to recovery but only mitigates damages.

305 U.S. 424, 431 (1939).

While true that neither the Supreme Court nor the Ninth Circuit have squarely addressed the application of assumption of risk in the recreational sports context, their wholesale rejection of the defense as a complete bar to suit in other areas has been uniform and emphatic. See, e.g., Mahnich v. Southern S.S. Co., 321 U.S. 96, 103 (1944); Jacob v. City of N.Y., 315 U.S. 752, 755 (1942); Socony-Vacuum Oil Co., 305 U.S. at 431; Simeonoff v. Hiner, 249 F.3d 883, 888 (9th Cir. 2001); DuBose v. Matson Nav. Co., 403 F.2d 875, 877 (9th Cir. 1968). The Northern District of California has also ruled persuasively on the issue. Manning v. Gordon, 853 F.Supp. 1187, 1188-89 (N.D. Cal. 1994).[2] In line with these decisions, and in accordance with its previous ruling, the Court again rejects Defendants' claims of an assumption-of-risk defense.

The Court likewise rejects L M Sports's position that they owed no duty to warn passengers of propeller strikes because the danger was open and obvious. In support of this position, L M Sports relies exclusively on non-binding authority, primarily from other circuits. The Ninth Circuit has only recognized the open-and-obvious defense in admiralty cases when claims are brought by ship repairmen, longshoremen, stevedores and vessel owners. See Howlett v. Birkdale Shipping Co., S.A., 512 U.S.

---

[2] The Central District of California adopted the Northern District's reasoning in Mavromati v. Spot, LLC, No. 14-cv-03333-SJO, 2016 WL 4820634 at *9 n.11 (C.D. Cal. Jan. 29, 2016).

92, 98-99 (1994) (finding shipowner did not owe stevedores a duty to warn of open and obvious danger); <u>Ludwig v. Pan Ocean Shipping Co., Ltd.</u>, 941 F.2d 849, 851 (9th Cir. 1991) (finding shipowner did not owe longshoreman duty to warn of open and obvious danger); <u>Peters v. Titan Nav. Co.</u>, 1989 A.M.C. 1598, 1601-02 (9th Cir. 1988) (finding shipowner did not owe ship repairmen duty to warn of condition he was hired to fix); <u>Grace Line, Inc. v. Todd Shipyards Corp.</u>, 500 F.2d 361, 365 (9th Cir. 1974) (finding wharfinger did not owe shipowner duty to warn of open and obvious danger).

The availability of this defense in cases brought by seamen and vessel owners stems, in part, from the symmetry of expertise between those who owe the duty and those to whom the duty is owed. For example, in <u>Ludwig</u>, 941 F.2d at 850, a longshoreman was injured when he stepped down off a ladder, into a coiled lashing cable left at the bottom. The longshoreman sued the owner of the ship he was working on, arguing that the owner breached his statutory duty to warn him of unsafe conditions on the boat. <u>Id.</u> at 850-51. The Court found that the cables would have been open and obvious to any "competent longshoreman" ascending the ladder; the longshoreman's "momentary forgetfulness" when descending the ladder "[did] not erase the notice given by [the cables'] presence." <u>Id.</u> at 851. In doing so, the Court explicitly distinguished between a longshoreman and "an average reasonable person." <u>Id.</u> at 852.

> A longshoreman is an expert who is required to be mindful of hazards—not forgetful of them. . . . [A] shipowner may rely on the expertise of longshoremen and leave unremedied conditions that would otherwise be considered

unreasonably dangerous to less skilled persons.  It is
for this reason that the question of whether an average
reasonable person would be excused from forgetting about
a hazard aboard ship is irrelevant when the issue is
whether a longshoreman should be excused from forgetting
such a hazard.

Id. (internal quotations and citations omitted).

The symmetry of expertise that exists between a
longshoreman and a shipowner does not exist between a
recreational rental boat owner and the occasional renter, making
"obviousness" relative.  The Court declines to extend the open-
and-obvious defense to this context.

Even if admiralty law did recognize an open-and-obvious
defense to negligence claims by recreational boat renters, it
would not apply here. The Court disagrees with L M Sports's
argument that a vague awareness of a boat's propulsion system
made the danger posed by the Four Winns obvious.  Hasset
testified that boats can be powered by propellers or jet
propulsion.  He also acknowledged that, even among boats with
propellers, there are differences in how far the propellers
extend from the back of the boat.

The parties provided several images depicting which parts
of the boat were visible above water.  The boat's propellers
were not visible in any of those pictures.  The only visible
evidence of the boat's propulsion system were the bubbles it
created when under power.  Those bubbles did not place the
passengers on notice that their boat was specifically powered by
propellers.  More importantly, they did not provide tubers
specific information about where those counter-rotating
propellers were in relation to where they would be re-boarding

the boat.  The Court finds that L M Sports had a duty to warn Palla of propeller strikes because the dangers here were not open and obvious.

Based on all the evidence admitted at trial, the Court concludes that L M Sports owed Palla a duty of reasonable care under the circumstances.  Given the circumstances present on July 24, 2016, L M Sports had a duty to warn the Palla group of dangers they were likely to encounter while tubing.  L M Sports breached this duty when it failed to warn Palla of the dangers of propeller strikes both generally and on her particular boat.  The Court also concludes L T Leasing did <u>not</u> breach a duty of care owed to Palla.

c.  Causation

L M Sports's failure to warn Palla of the dangers she was likely to face while tubing was a proximate cause of her injuries.  As with a claim of common law negligence, plaintiffs must make a showing of proximate causation to sustain a negligence claim arising in admiralty.  <u>Exxon Co., U.S.A. v. Sofec, Inc.</u>, 517 U.S. 830, 832 (1996).  Proximate cause serves as "a means of cutting off liability for consequences that, although causally related to the defendant's negligent conduct, are not so closely connected with this conduct to justify the imposition of liability."  <u>Weyerhaeuser</u>, 777 F.2d at 1351.

Admiralty law also recognizes "superseding causes."  <u>Exxon</u>, 517 U.S. at 837.  A superseding cause severs the causal link between a careless actor and a subsequent injury when "the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by

27

a later cause of independent origin that was not foreseeable." Id. (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994)).

The Court finds that L M Sports's failure to warn Palla of the location of the propellers, the dangers associated with them, and the measures she could have employed to protect herself from injury due to a propeller strike was a proximate cause of her injuries. Palla's uncontested testimony revealed that she was a cautious individual. Because she had never gone tubing before, she waited for others to go first to see how it was done. Palla tried to be cognizant of what was going on around her when attempting to re-board the Four Winns after tubing. She testified that, being mindful of how the choppiness of the water would make it difficult to grab the ladder from the side, she swam past the ladder, turned around, and approached it head on. The Court is persuaded by a preponderance of the evidence that had L M Sports instructed Palla to also be mindful of the proximity of the boat's propellers to the boarding ladder, she would have been.

While the Court finds that Garcia was the primary cause of Palla's injuries, his actions do completely not cut off L M Sports's liability because those actions were foreseeable. Palla's legs were struck by the propellers because the rental boat was in idle reverse shortly before she attempted to board. The preponderance of the evidence suggests that Garcia inadvertently pulled the throttle past neutral, briefly putting the boat into reverse before locking the control into neutral. At trial and through deposition testimony, witnesses gave

28

seemingly conflicting testimony about the boat's movement when
Garcia was picking up Palla.  Garcia testified that he put the
Four Winns in neutral when picking up all tubers, including
Palla, and that he never put the boat in reverse.  In line with
this testimony, several members of the Palla group testified
that they remembered the boat being still after Garcia circled
around to pick up Palla.  Palla similarly recounted that the
boat was not moving backward as she approached the boat to re-
board.  Yet, the damage to Palla's legs clearly suggests that
the propeller blades were moving at some speed.  And, as
explained by Lt. Lovell, the damage to the trailing edge of the
propellers indicates that the blades were spinning in reverse
when they struck Palla.  The Court's finding that Garcia
accidently pulled the throttle into reverse before settling it
into neutral best reconciles otherwise conflicting accounts of
credible witnesses.

Testimony from the parties' experts also supports the
Court's finding.  Dr. Sanders testified that the throttle on the
rental boat "clicked" into each gear if the operator released
the red lever at the bottom of the throttle.  If, however, the
operator kept the red lever compressed, he could pull it from
forward into reverse without the throttle clicking into neutral.
Dr. Osinski testified that it is common for novice boaters to
make this mistake because the difference between neutral and
idle reverse can be imperceptible.

Garcia bears the vast majority of the responsibility for
Palla's injuries because he did not follow Foss's instructions
to turn off the boat's engine when picking up tubers.  In doing

so, he breached the duty of ordinary care that he owed to Palla. Even so, Garcia's mishandling of the Four Winns does not amount to a superseding cause such that it cuts off Defendants' liability because his failure to follow instructions was foreseeable. Meeks testified that a rental boat's operator was the most dangerous part of the boat, and Hasset testified that he knew inexperienced and inattentive operators would be driving his rental boats. More specifically, Meeks testified that, in 2016, he knew an operator might put a boat in neutral, thinking it was off. Dr. Osinski gave further weight to Meeks's testimony when she testified that both putting a boat in neutral instead of turning it off and inadvertently pulling the throttle past the neutral position were common mistakes that she would expect rental boat operators to make.

Despite the clear risk posed by inattentive and inexperienced operators, L M Sports did not train Foss to decrease this risk by giving operators demonstrative training on how the throttle worked. Nor did L M Sports train Foss to warn operators of the dangers of shifting the throttle past neutral. L M Sports did not provide operators with a checklist of these critical safety instructions to use while out on the lake. And although Foss instructed Garcia to turn the boat completely off when picking up tubers, the Court did not find Foss's testimony that he repeatedly emphasized this instruction, carefully highlighting the difference between "off" and "neutral," to be credible. The known predisposition of rental boat operators to be inattentive and careless—when combined with the barebones instructions L M Sports provided—made Garcia's failure to follow

all of Lakeside's instructions foreseeable. The Court finds

that L M Sports was a proximate cause of Palla's injuries.

### d. Damages

Palla sustained severe injuries on both of her legs as a

result of the propeller strike. The severity of the injuries on

her right leg required the doctors at Renown Medical Center in

Reno, Nevada to amputate it right above the knee. The fact that

Palla sustained damages is undisputed. The amount of damages to

which Palla is entitled will be determined in a subsequent jury

trial.

### e. Comparative Fault

When an accident has multiple causes, a court must allocate

liability among all individuals and entities responsible.

Reliable Transfer Co., 421 U.S. at 411. The doctrine of

comparative fault requires the court to make "an individualized

evaluation of [the] collision . . . [and] to compare the fault

of each party, where fault is defined as blameworthy conduct

which contributes to the proximate cause of the loss or injury."

Crowley, 530 F.3d at 1174 (quoting Pan-Alaska Fisheries, Inc. v.

Marine Constr. & Design Co., 565 F.2d 1129, 1139 (9th Cir.

1977))

Based on the evidence admitted at trial and the findings

and conclusions set forth above, the Court finds L M Sports to

be 20% at fault and Garcia to be 80% at fault for Palla's

injuries. L M Sports created an unreasonable additional risk to

Palla when it failed to warn her of the risks of propeller

strikes when re-boarding a boat after tubing. L M Sports

presented a video during trial to illustrate how the Four

Winns's propellers spun depending on what gear the boat was in. The video showed that, even when the boat's engine was off, its propellers continued to spin so long as the boat was moving through the water. Therefore, even when a boat operator follows a Lakeside Marina dockhand's instruction to turn the engine off when picking up tubers, a tuber is still at risk of getting struck by a propeller—particularly on the Four Winns. L M Sports could have alleviated this risk at little to no cost to the company. It chose not to. While this decision contributed to Palla's injuries, the Court finds it was not the primary reason for this tragic accident. The Court's allocation of 20% fault is consistent with L M Sports's level of blameworthiness.

The Court concludes that Garcia is 80% at fault because it is uncontroverted that his negligent operation of the boat directly caused Palla's injuries. Garcia made a mistake. He either misunderstood Foss's instructions, forgot them, or chose not to follow them. Either way, he breached the duty of ordinary care that he owed to Palla when he failed to turn the boat off as she was re-boarding the boat. His failure to operate the boat correctly was the primary cause of Palla's injuries. Although Palla could have been struck by the propeller even if the boat's engine was off, her injuries would have likely been much less severe given the decreased speed of the propeller blades. 80% is an appropriate allocation of fault given Garcia's role in the accident.

L T Leasing is 0% at fault for Palla's injuries.

Palla is also 0% at fault. Palla was 22 years old at the time of the accident and had never been towed behind a boat.

She had been a passenger on a boat only a handful of times in her life.  L M Sports's failure to warn Palla of the known risk of propeller strikes prevented her from exercising the level of care necessary when re-boarding the Four Winns after tubing.  Furthermore, Garcia's representation that he had stopped the boat deprived Palla of any reason to believe that she should not have attempted to re-board.

### 3.   Privity or Knowledge

Because Palla proved by a preponderance of evidence that L M Sports was negligent, L M Sports bore the burden of proving that it lacked privity or knowledge of "the act or condition [causing the accident]."  In re BOWFIN M/V, 339 F.3d at 1137.  The Court concludes that L M Sports did not make this showing.

L M Sports argues that it lacked knowledge because it could not have known that Garcia was going to accidentally put the boat in reverse while Palla was re-boarding the boat.  The Court disagrees with L M Sports's characterization of this analysis.  The focus of the inquiry is not whether L M Sports could have predicted the exact consequences, but rather, whether L M Sports knew of the risk its negligence posed.  See Holzhauer v. Golden Gate Bridge Highway & Transportation District ("Holzhauer II"), 745 Fed. Appx. 265, 269 (9th Cir. 2018).  More specifically, this issue requires the Court to determine whether L M Sports knew that it was allowing its customers to go tubing without providing any warnings to the individuals who would be in the water and most at risk of a propeller strike.  The Court finds that it did.

A company's failure to formulate and implement a necessary safety policy may support a finding of knowledge.  In Holzhauer

II, 745 Fed. Appx. At 267-69, a speedboat passenger was killed when the speedboat and a passenger ferry collided.  The captain of the ferry had been using his cell phone right before the accident occurred.  Id. at 269.  The district court found that the captain's use of a cell phone while operating a ferry was a negligent condition, and that Defendant Golden Gate Bridge Highway and Transportation District ("GGB") had constructive knowledge of that condition.  Even though "there was no evidence that [GGB] was 'on notice' of similar prior incidents," it could have "discover[ed] with reasonable investigation that ferry operators used their cellphone[s] while operating the ferry."  Id.  Despite this knowledge, GGB did not have a policy against personal cell phone use.  Id.  The Ninth Circuit affirmed the district court, finding the defendants failed to show they lacked knowledge of a negligent condition.  Id.

The negligent act at issue here is L M Sports's policy of training Lakeside Marina dockhands to only provide boating and safety instructions to rental boat operators.  At the time of the accident, Hasset and Meeks were collectively in charge of formulating Lakeside Marina's employee training policies.  Their testimony at trial revealed that they knew they were renting boats out for tubing, without providing tubers any information on the dangers of tubing generally or on the dangers of tubing behind the 1997 Four Winns specifically.  Hasset and Meeks's knowledge is imputed to L M Sports.  See United States v. Standard Oil of California, 495 F.2d 911, 917 (9th Cir. 1974) ("In short, the [privity or knowledge] inquiry must focus on whether the negligence is that of 'managing officers' or, more

34

properly, 'supervisory employees.'").

L M Sports's otherwise clean safety record does not preclude a finding of knowledge here.  See Holzhauer II, 745 Fed. Appx. at 269.  Hasset testified that he knew people in the water were most at risk of propeller strikes and that propeller strikes could be deadly.  Notwithstanding this knowledge, he knowingly maintained a policy of only providing safety instructions to rental boat operators.  The knowledge prong of the limitation action does not exist so that a marina owner may gamble on the safety of his customers, then feign ignorance when that bet goes sour.  The Court finds that L M Sports knew that it was negligently failing to warn rental boat passengers of the risks they were likely to face while tubing.  The limitation of liability does not apply.

## IV.   CONCLUSIONS OF LAW AS TO LIABILITY

For the reasons set forth above, the Court concludes as follows:

1.    L T Leasing owed a duty of reasonable care under the circumstances to Palla.

2.    L T Leasing did not breach its duty of care to Palla, i.e. it did not fail to provide a boat that was fit for its intended purpose.

3.    L M Sports owed a duty of reasonable care under the circumstances to Palla.

4.    L M Sports breached its duty of care by not warning Palla of the location of the propellers, the dangers of propeller strikes generally, or the dangers of propeller strikes when towed behind the 1997 Four Winns, and how to avoid injury.

35

5.    This breach by L M Sports was a proximate cause of Palla's injuries.

6.    Garcia owed a duty of ordinary care to Palla.

7.    Garcia breached his duty of care to Palla by failing to stop the boat's propellers and by putting the boat in reverse as Palla approached the swim ladder after going tubing.

8.    Garcia's negligence was a proximate cause of Palla's injuries.

9.    L M Sports was 20% at fault for Palla's injuries.

10.   Garcia was 80% at fault for Palla's injuries.

11.   L T Leasing was 0% at fault for Palla's injuries.

12.   Palla was 0% at fault for her injuries.

13.   The negligence of L M Sports was within its knowledge or privity.  L M Sports knew that it did not properly train its employees to warn passengers of the dangers of propeller strikes despite the fact that propellers posed a deadly threat to its tubing customers.

V.   ORDER

Given the Court's findings of fact and conclusions of law, a jury trial to determine the amount of Palla's damages will commence on September 23, 2019 at 9 a.m.  The Court will hold a Pretrial Conference on August 16, 2019 at 10 a.m.

IT IS SO ORDERED.

Dated:  May 16, 2019

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE

36