8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   Manisha Palla,                    No.  2:16-cv-02865-JAM-EFB

12          Plaintiff,

13     v.                              **FINDINGS OF FACT AND CONCLUSIONS OF LAW—DAMAGES PHASE**

14   L M SPORTS, INC. dba LAKESIDE
     MARINA and dba ACTION
15   WATERSPORTS OF TAHOE; L T
     LEASING, INC.; PAUL GARCIA;
16   and DOES 1-50, inclusive,

17          Defendants.

18   _____

19   AND RELATED ACTIONS.

20   _____

21       Following an accident on Lake Tahoe that resulted in an

22   above the knee amputation of her right leg, Plaintiff Manisha

23   Palla brought a negligence claim against L M Sports, Inc.; L T

24   Leasing, Inc.; and Paul Garcia.  L M Sports and L T Leasing then

25   filed a limitation of liability action under 46 U.S.C. §§ 30505

26   et seq.  The Court consolidated the two cases, then bifurcated

27   the issues of liability and damages.  See Related Case Order, ECF

28   ///

No. 12; Palla v. L M Sports, No. 2:16-cv-02975-JAM-EFB, 2019 WL
427300 (E.D. Cal. Feb. 4, 2019).

Garcia initially participated in the suit. But since the
withdrawal of his attorney in June 2018, ECF No. 72, Garcia has
only made one appearance with the Court: on March 4, 2019, when
he testified during the liability phase of the trial.

After conducting a ten-day bench trial on the issue of
liability, the Court issued findings of fact and conclusions of
law. ECF No. 284. Ultimately, the Court found Garcia and L M
Sports's negligence caused Palla's injuries. Id. 35-36. It
further found Garcia was 80% at fault for Palla's injuries and
that L M Sports was 20% at fault. Id. at 31-33. Finally, the
Court concluded L M Sports failed to show it lacked knowledge of
the negligent conditions that gave rise to Palla's injuries. Id.
at 33-36. As a result, it was not entitled to the limitation on
liability afforded by section 30505(b). Id. L M Sports appealed
the Court's decision in this first phase of the lawsuit. ECF No.
287.

Having waived her right to a jury trial, the Court proceeded
to hold a nine day bench trial on the issue of Palla's damages.
See ECF Nos. 309, 345. Palla and L M Sports offered in-person
and deposition testimony from Palla, four people who were on the
boat when the accident occurred, a first responder, a treating
physician, Palla's mother, Palla's friend and co-worker, and
seven expert witnesses. Numerous exhibits were also admitted at
trial by both parties. The Court has considered the documentary
evidence, the testimony of each witness, as well as the parties'
trial briefs, their joint pretrial statement, and their

2

stipulations.  See ECF Nos. 316, 335, 336, 329.

I.   FINDINGS OF FACT

**Palla's Background**

1.   Manisha Palla was born to Suvarana and Sukender Palla on May 8, 1994 in San Jose, California.

2.   She was raised by her maternal grandmother in Hyderabad, India and Portland, Oregon for the first five years of her life.

3.   Palla spent the rest of her childhood in Portland, Oregon with her mother, father, and younger brother.

4.   Growing up, Palla maintained a strong academic record, had lots of friends, and participated in several extracurricular activities, including basketball, volleyball, and taekwondo.

5.   Palla travelled extensively—both domestically and internationally.

6.   Palla testified that, before her accident, she never had hesitations about traveling; nor did she feel like there were physical limitations on what she could do.

7.   For example, Palla had been backpacking, skydiving, and regularly went camping with her family.

8.   After Palla graduated from high school, she moved to Atlanta, Georgia, where she attended Emory University.

9.   At Emory, she continued to lead an outgoing and active lifestyle.

10.  Palla graduated from Emory when she was twenty-two and began working at System Application Products ("SAP").

11.  Palla was excited to have a job in an internationally-

3

1  focused company, and eager to make her way as a woman in an
2  industry dominated by men.

3      12.  She met Mariah Koeltl during the SAP interview process.
4      13.  Palla and Koeltl became fast friends when SAP hired
5  them to both work in its Chicago office.

6      14.  They saw each other at work nearly every day.

7      15.  They ran together; planned trips together; went to
8  social gatherings together; and talked about their hopes for the
9  future.

10  **The Accident on Lake Tahoe**

11      16.  On July 24, 2016 Palla went to Lake Tahoe with a group
12  of her SAP co-workers.

13      17.  The group went tubing on the lake with a boat and an
14  innertube they rented from L M Sports.

15      18.  After Palla took her turn tubing, she swam back to the
16  boat.

17      19.  When re-boarding, her legs were struck by the boat's
18  propellers.

19      20.  Palla's screams alerted people on the boat of her
20  injuries.

21      21.  She felt excruciating pain in one of her legs, but no
22  sensation in the other.

23      22.  One of her legs had been struck by the propeller, while
24  the other was completely lodged between the two counter-rotating
25  propeller blades.

26      23.  Palla reached down to touch one of her legs—it felt
27  "squishy in some parts" and "hard in other parts."  She testified
28  that it did not feel like an "in tact human leg."

4

1  24. Efe Ozyurt, Regan Roberts, Sean O'Dea and Alvaro
2  Gilsanz Herranz jumped in the water to help Palla.

3  25. They were unable to free Palla's leg from the blades.

4  26. The police and the boat rental company were called for
5  help.

6  27. While awaiting help, Ozyurt and O'Dea held Palla's face
7  out of the water to prevent her from drowning.

8  28. Notwithstanding their efforts, Palla's face still sunk
9  below the water several times.

10  29. Palla testified that she thought she was going to die.

11  30. When Deputy Les Lovell arrived at the scene, Palla was
12  "paling gray," nearing unconsciousness.

13  31. Lovell and his partner freed Palla from the propellers
14  and handed her over to Marine One.

15  32. When Lovell removed Palla from the water, she was
16  unconscious and no longer bleeding.

17  33. At that point, Lovell believed Palla was "either dead
18  or in grave shape."

19  **Palla's Stay at Renown Memorial Hospital**

20  30. Palla did not regain consciousness until the morning
21  after the accident.

22  31. She was alone when she awoke, intubated, at Renown
23  Memorial Hospital.

24  32. Palla got the attention of a nurse outside her room.

25  33. The nurse came in and pulled back the blanket covering
26  Palla; Palla saw for the first time that the doctors had
27  amputated her right leg above the knee.

28  34. Palla's mother ("Dr. Palla") went to her daughter's

1  hospital room once she learned Palla was conscious.

2      35.  Palla wrote her mother notes, asking whether she would
3  still be able to accomplish the goals she once had.

4      36.  Palla feared she would never run again; that she would
5  never get married; that she would face discrimination in India;
6  and that she would lose her job.

7      37.  Dr. Palla could not provide her daughter reassurance;
8  they both cried.

9      38.  Four days after the amputation of her right leg, Palla
10  began experiencing severe phantom pain.

11      39.  Palla testified her phantom pain felt like
12  electrocutions where her lower right leg used to be.

13      40.  By July 31, Palla was experiencing phantom pain all
14  hours of the day.

15      41.  Palla returned to Portland, Oregon on August 4, 2016.

16      42.  Her mother learned how to change Palla's bandages and
17  watch for eschar so Palla could recover at home rather than at a
18  rehabilitation center.

19  **Palla's Rehabilitation in Portland, Oregon**

20      43.  Palla spent five months recovering at home in Portland,
21  Oregon.

22      44.  Her phantom pain improved during this period of time
23  but never went away completely.

24      45.  Palla also had trouble sleeping.

25      46.  Despite taking anti-anxiety and anti-depressant
26  medication, she consistently suffered from nightmares where she
27  would effectively re-live the accident on Lake Tahoe.

28      47.  While in Portland, Palla required her mother's help to

6

1   get out of bed, go to the restroom, shower, change her wound
2   dressings, and prevent blood clots from forming.

3      48.  Palla went to a hypnotist once while she was in
4   Portland.

5      49.  She did not, however, see a therapist.

6      50.  During the first month of her rehabilitation, Palla
7   developed necrotic tissue on her residual limb.

8      51.  Necrotic tissue is tissue that has died because it
9   lacks sufficient blood supply—it causes skin discoloration and
10  poses risks of infection.

11     52.  Palla's doctor recommended non-surgical treatments for
12  Palla's necrosis.

13     53.  When these non-surgical treatments failed, Dr. Palla
14  took her daughter to Dr. Samuel Vincent Bartholomew.

15     54.  Bartholomew recommended surgeries to cut out the dead
16  tissue ("debridement") and then graft healthy tissue onto the
17  open wound.

18     55.  Bartholomew performed the first debridement surgery on
19  September 6, 2016 and conducted two more debridements over the
20  next three weeks.

21     56.  Between each of the debridements, Dr. Palla had to
22  change the dressings on Palla's wound several times a day.

23     57.  Each time Dr. Palla put new gauze on the wound, it
24  dried to the tissue and fat below.

25     58.  When removed, the gauze ripped apart from the
26  underlying wound.

27     59.  Palla testified this was an extremely painful process—
28  both because of the physical pain and because of the guilt she

7

1    felt for causing her mom so much anguish.

2         60.  On September 27, Bartholomew performed a successful
3    skin graft.

4         61.  He used skin from Palla's upper left thigh as the donor
5    site.

6         62.  Palla now has a large, rectangular scar in that area.

7         63.  While recovering, Palla largely spent her time in bed.

8         64.  She also spent some time writing.

9         65.  She published two blog posts: one called "Opportunity
10   of Adversity" and one called "38.991° N, 102.010° W".

11        66.  Later, one of Palla's friends from Emory interviewed
12   her for People magazine.

13        67.  In 2017, People published the interview in an article
14   titled, "I lost my leg . . . and couldn't feel luckier."

15        68.  Palla testified that her interview and blog posts were
16   attempts to candidly explain where she was in her recovery
17   process, while also being hopeful and inspirational.

18        69.  Eventually, Palla was fitted for a prosthetic leg.

19        70.  The first time she saw her prosthesis, she cried.

20   **Palla's Return to Work in Chicago**

21        71.  Bartholomew released Palla to work on December 5, 2016.

22        72.  Notwithstanding her mother's reluctance, Palla insisted
23   upon returning to work the following month.

24        73.  In January 2017, Palla attended SAP's Field Meeting
25   Kickoff in Las Vegas, Nevada.

26        74.  Palla then returned to work in SAP's Chicago office.

27        75.  Upon returning, Palla began and completed training with
28   a new class of SAP employees.

8

1    76.  She received a title change at same time as her
2 colleagues in that class.

3    77.  Initially, Palla wore dresses and skirts to work; this
4 was consistent with how she dressed before losing her leg and
5 allowed her to more comfortably move around with her prosthesis.

6    78.  Eventually, however, she started dressing to hide her
7 prosthesis—an attempt to avoid stares and invasive questions from
8 clients, co-workers, and strangers.

9    79.  Koeltl was still working in the Chicago office when
10 Palla returned to work.

11    80.  Koeltl has never heard anyone speak poorly of Palla's
12 performance at work.

13    81.  Even so, Koeltl was cognizant of the many ways Palla
14 had changed since her accident.

15    82.  Koehltl testified Palla had trouble traveling by plane,
16 attended fewer social events, walked with an uneven stride, and
17 generally moved around more slowly than she did before her
18 accident.

19    83.  The pain in Palla's residual limb and in her
20 contralateral leg prevented, and continues to prevent, her from
21 walking more than a few blocks without taking a break.

22    84.  As a result, Palla began using rideshare applications
23 to get to places to which she used to walk.

24    85.  She also began attending fewer social events.

25    86.  Palla testified that it takes more energy and advanced
26 planning for her to go to social gatherings than it did before
27 she lost her leg.

28    87.  She sometimes fears that going out with friends will

9

1  deprive her of the energy she needs to do her job well.

2       88.  Palla's main priority is keeping her job with SAP.

3  **Palla's Move to Philadelphia**

4       89.  Palla eventually applied for a transfer to SAP's
5  Philadelphia, Pennsylvania office.

6       90.  Following an interview process, SAP awarded Palla the
7  position.

8       91.  Palla now lives in a high-rise studio apartment about
9  forty-five minutes away from SAP's offices in Newtown Square.

10      92.  The apartment has an elevator and covered parking.

11      93.  Palla takes advantage of online delivery services to
12  get her groceries but can do most other household chores on her
13  own.

14      94.  As a senior account executive, Palla manages around
15  twenty-five accounts in a territory that ranges from Maine to
16  Virginia.

17      95.  SAP requires its senior account executives to meet
18  quarterly and annual quotas.

19      96.  Palla testified that if an account executive fails to
20  meet her quotas, SAP may fire her or reassign part of her
21  territory.

22      97.  Palla understands that she is entitled to
23  accommodations through her employer.

24      98.  She nonetheless fears that taking time off from work
25  for appointments related to her injury places her job with SAP at
26  risk.

27      99.  Palla has not requested any accommodations from SAP.

28      100. She can generally travel to her most-frequented sites

10

1  by train; in Chicago she had to travel by plane for many of her
2  client visits.

3  **Palla's Post-Accident Travels**

4     101. Palla has travelled domestically and internationally
5  since her accident.

6     102. When possible, Palla prefers to travel by car and by
7  train.

8     103. Palla drives with her left foot by bending her residual
9  limb back toward her and crossing her left leg over her residual
10  limb toward the gas pedal.

11     104. She stops at least once every hour because of the pain
12  this position causes her residual limb.

13     105. Palla knows it is possible to modify her car so she
14  could more easily drive with her left foot.

15     106. She testified, however, that she does not want to get
16  into the habit of driving in a car with modifications because she
17  often has to drive unmodified rental cars when traveling for her
18  job.

19     107. When Palla travels by plane, TSA requires her to
20  undergo invasive, additional security checks.

21     108. Palla testified that TSA agents must see the top of her
22  prosthetic device before she passes through security.

23     109. This process requires her to go to a separate room and
24  partially undress every time she goes to the airport.

25     110. It is also difficult for Palla to travel by plane
26  because (a) she often needs to walk long distances between gates,
27  (b) changes in elevation cause swelling in her residual limb; and
28  (c) the size of airplane restrooms prevents her from effectively

11

1  removing or adjusting her prosthetic if necessary.

2      111. Palla has never requested accommodations for her
3  disability at an airport in anticipation of a flight and does not
4  have specific plans to do so in the future.

5      112. Palla has traveled to Germany once for work.

6      113. On that trip, Palla's prosthesis stopped fitting
7  correctly, leaving her unable to walk.

8      114. She had to return to Chicago early.

9      115. Palla has also taken personal trips to Iceland,
10  England, Switzerland, France, and Colombia.

11      116. Although she was not able to participate in all the
12  activities she would have done before her accident, Palla did not
13  have to end any of these trips early because of her disability.

14      117. Palla has not visited India since her accident.

15      118. Palla's mother, on the other hand, last visited India
16  in June 2018.

17      119. Dr. Palla found that only a very small percentage of
18  buildings were handicap-accessible.

19  **Palla's Recurring Issues**

20      120. Palla continues to experience intermittent phantom
21  pain.

22      121. Palla also experiences fatigue in her residual limb and
23  contralateral leg, instability in her contralateral knee, and
24  pain in her hip, back, and contralateral ankle.

25      122. Palla stopped taking prescription pain medication in
26  January 2017 because she feared developing a dependency.

27      123. She now only takes Advil and Tylenol for phantom pain
28  relief.

                                12

1    124. Palla does not work out with the same consistency she
2    did before her injury.

3    125. Working out causes strain on her contralateral knee
4    that makes it difficult for her to keep up with the physical
5    demands of her job.

6    126. Palla has gone to physical therapy in the past but does
7    not currently go to physical therapy.

8    127. Moreover, she does she have specific plans to try
9    physical therapy again in the future.

10   128. Palla has tried other physical modalities to address
11   the physical pain in her hips, back, and contralateral joints.

12   129. Palla does five- to ten-minute stretching exercises at
13   home to help manage her pain.

14   130. She has also tried massage therapy and acupuncture.

15   131. Palla can reduce the pain in her residual limb by
16   taking her prosthetic off and/or lying down.

17   132. She addresses her phantom pain by walking around her
18   apartment and waiting for the pain to subside.

19   133. Palla's use of her prosthesis has improved over the
20   past three years.

21   134. Specifically, Palla's prosthesis expert, Drew
22   Hittenberger, testified Palla has good balance, understands where
23   her prosthetic is in space, and can put her prosthesis on without
24   holding onto anything.

25   135. Even so, Palla still sometimes struggles to maintain
26   her balance when walking with her prosthesis or standing without
27   her prosthesis.

28   136. Palla testified that she has one or two "major falls"

                                13

1 (where she falls completely to the ground) per year.

2 137. She also has one "catch-herself fall" (where she trips
3 but catches herself before falling to the ground) every one or
4 two weeks.

5 138. Alongside her physical pain, Palla struggles with
6 feelings of insecurity, frustration and embarrassment.

7 139. Palla copes with the emotional consequences of her
8 injury by talking to close family and friends, going to church,
9 and meditating.

10 140. She has not, however, told her family members in India
11 about her accident or the resulting amputation.

12 141. Based on the time she has spent in India, Palla fears
13 her extended family would view her as "less than" if they found
14 out she was an amputee.

15 142. Nevertheless, Palla's decision not to tell her family
16 in India about her injury "w[ears] on her."

17 143. In Chicago, she went to therapy once a week for six
18 months.

19 144. She also attended one support-group meeting.

20 145. Palla testified that she did not continue going to
21 therapy or the support group because she did not find them
22 helpful.

23 146. She does not have specific plans to try therapy or
24 support groups again in the future.

25 147. In November 2018, she attended a ten-day meditation
26 retreat in California, and found it helpful.

27 148. Palla testified she would be interested in continuing
28 to go to meditation retreats.

14

1          II.    OPINION

2     A.    Damages

3          A plaintiff bears the burden of proving her damages by a
4     preponderance of the evidence.    Model Civ. Jury Instr. 9th
5     Cir. 5.1.    A plaintiff who meets this burden is entitled to the
6     "amount of money that will reasonably and fairly compensate the
7     plaintiff for any injury . . . caused by the defendant."    Id.    A
8     fact-finder must consider several factors to determine what
9     measure of damages will reasonably and fairly compensate the
10    injured party, including: the nature and extent of the injuries;
11    the disability, disfigurement, and/or loss of enjoyment of life
12    experienced; the mental, physical, and/or emotional pain and
13    suffering experienced;   the reasonable value of necessary
14    medical care, treatment and services received; and the
15    reasonable value of necessary household help and/or non-medical
16    services required.    Model Civ. Jury Instr. 9th Cir. 5.2.    When a
17    plaintiff claims future damages, the fact-finder must also
18    consider whether the damages already incurred will, "with
19    reasonable probability," also be incurred in the future.    Id.

20    1. Life Expectancy

21         Palla was born on May 8, 1994.    She was 22 years old when
22    she was injured.    She was 25 years old at the time of trial and
23    at the date of this Order.    The parties stipulate that her life
24    expectancy is 82.    Pretrial Conference Order at 12, ECF No. 321.

25    2. Past Economic Damages

26         Palla claims past economic damages.    First Am. Compl.
27    ("FAC") ¶ 51.    The parties stipulate Palla incurred $305,762.03
28    in reasonable and necessary past medical costs.    ECF No. 329.

15

1  Palla does not seek past loss of earnings or income. Pretrial
2  conference Order at 12.   The Court accepts the parties'
3  stipulation and awards Palla $305,762.03 in past economic
4  damages.

### 3. Future Economic Damages

6  Palla also contends she is entitled to future economic
7  damages.  Although L M Sports concedes Palla is entitled to some
8  measure of damages for future medical expenses reasonably
9  incurred as a result of her injury, it disagrees with the
10 amount.   At trial, Plaintiff presented testimony from Drew
11 Hittenberger, a prosthetist, and Dr. Christopher Stephenson, a
12 physiatrist.   The Court found Hittenberger and Stephenson
13 qualified as experts in their respective fields.  Hittenberger
14 testified about the prosthetic devices and associated expenses
15 Palla would reasonably incur throughout her life.   Stephenson
16 provided testimony about other equipment, services, surgeries,
17 and treatments that he believed Palla would reasonably require
18 because of her disability.   In response, L M Sports elicited
19 testimony from their retained experts—Rick Chavez, a
20 prosthetist, and Dr. Suzy Kim, a physiatrist.   The Court found
21 Chavez and Kim likewise qualified as experts in their respective
22 fields.

23 The Court did not find the testimony of Hittenberger,
24 Stephenson, Chavez, or Kim to be persuasive *in toto*.   Rather, it
25 found certain aspects of each expert's proposed life-care plan
26 credibly assessed the care, treatment, equipment and services
27 that Palla will, with reasonable probability, require in the
28 future.   The lists that follow reflect those credibility

1 | determinations.

2 |     The Court finds that over the course of her lifetime, Palla

3 | will, with reasonable probability, require:

4 | **Prosthetic Devices**

5 |     • 11 replacement walking prostheses;

6 |     • 11 walking prosthesis socket replacements;

7 |     • A sports prosthesis;

8 |     • Eight replacement sports prostheses;

9 |     • Seven sports prosthesis socket replacements;

10 |     • A backup walking prosthesis;

11 |     • Three replacement backup walking prostheses;

12 |     • A foot orthotic;

13 |     • 21 replacement foot orthotics; and

14 |     • Prosthetic device maintenance (10% of prosthesis cost).

15 | **Physiatrist Visits**

16 |     • Four physiatrist visits per year for ages 25-27; and

17 |     • Two physiatrist visits per year for ages 27-82.

18 | **Orthopedist Visits**

19 |     • Two orthopedist visits between ages 25-30;

20 |     • Four orthopedist visits between ages 31-40;

21 |     • Seven orthopedist visits between ages 41-50;

22 |     • Eight orthopedist visits between ages 51-60; and

23 |     • One orthopedist visit per year for ages 61-82.

24 | **Physical Pain Management**

25 |     • One tube of compound cream per month for life;

26 |     • One acupuncture session per month for ten years;

27 |     • Two physical therapy sessions per year for ages 25-40;

28 |     • Five physical therapy sessions per year for ages 41-60;

1  • Six physical therapy sessions per year for ages 61-82;
2    and

3  • 15 occupational therapy sessions for life.

4  **Emotional Pain Management**

5  • 50 counseling sessions for life; and

6  • One meditation retreat per year for life.

7  **Surgical/Emergency Services**

8  • Five emergency room visits for life; and

9  • Two knee arthroscopies for life.

10 **Attendant Care**

11 • 15 hours per month from ages 25-60; and

12 • 40 hours per month from ages 61-82.

13 **Wound Care**

14 • Three regular visits; and

15 • Eight nursing visits.

16 **Other**

17 • A total gym;

18 • A power therapy table;

19 • Seven replacement power therapy tables;

20 • A portable shower bench;

21 • Seven replacement shower benches;

22 • A TENS unit;

23 • 14 replacement TENS units;

24 • A set of TENS unit electrodes;

25 • 227 replacement sets of TENS unit electrodes;

26 • A pair of Mobileg crutches;

27 • 14 replacement pairs of Mobileg crutches;

28 • A set of three resistance bands;

1    • 28 replacement sets of resistance bands;

2    • A set of two foam rollers;

3    • 56 replacement sets of foam rollers;

4    • A wheelchair; and

5    • Seven replacement wheelchairs.

6    The Court found credible the testimony of Carol Hyland regarding

7    the cost of these items and services. As a result, the Court

8    finds that, before conducting a present-value calculation,

9    Palla's future economic damages are $2,912,344.63.

10   Neither party's economist conducted a present value

11   calculation for this total, and the Court does not endeavor to

12   render its own calculation. Using the spreadsheet attached as

13   Exhibit 1 to these findings of fact and conclusions of law, the

14   Court orders the parties to file supplemental reports with the

15   Court that calculate the present value of the $2,912,344.63

16   award for future economic damages. The parties must use the

17   same economists who testified at trial. Moreover, those

18   economists must use the same methodologies used in their

19   original reports and described to the Court. Alternatively, the

20   parties may stipulate to the present value of the above-listed

21   amount.

22                   4. Past Non-economic Damages

23   Palla is also entitled to past non-economic damages. As

24   both parties acknowledge, calculating non-economic damages is

25   not an exact science. The Court must consider the relevant

26   factors set forth in the Ninth Circuit's Model Civil Jury

27   Instruction 5.2 and, bearing those factors in mind, determine

28   what measure of damages will reasonably and fairly compensate

                                   19

Palla for her non-economic injury. Model Civ. Jury Instr. 9th Cir. 5.1. The testimony presented at trial indicated that Palla suffered varying levels of physical and emotional suffering during her accident, recovery, and acclimation to life as a transfemoral amputee. As discussed below, the Court assigns damages to those phases accordingly.

The most severe period of Palla's suffering, was, of course the accident itself, followed closely thereafter by five months spent in the hospital and at home in Portland recuperating from her injuries. The Court finds $5,500,000 reasonably and fairly compensates Palla for: (1) the fear and excruciating pain she experienced while caught in the boat's propeller; (2) for the time she spent in the hospital following her amputation—when she realized she lost her leg, began undergoing the first stages of recovery, and started experiencing her first, and most severe, bouts of phantom pain; (3) for her first two months in Portland, Oregon, during which she underwent three debridement surgeries and a skin graft and experienced the emotional suffering of coming to terms with her amputation, along with the severe physical pain of five wound dressing changes every day for nearly a month; and (4) for the remaining three months she spent recovering in Portland. Although the testimony does not indicate that this period of recovery was as physically and emotionally trying as the first two months, the Court does not find—as Defendant would have it—that the blogs Palla published and the interview she participated in reflect an absence of severe physical and emotional injury.

The Court further finds $2,500,000 reasonably and fairly

compensates Palla for non-economic injuries she suffered from
January 2017 through the date of this Order. The testimony at
trial showed that, prior to her accident, Palla moved through
the world as a physically- and socially-active, able-bodied,
confident young woman, eager to embark on international travels
and more than capable of taking on a demanding work schedule.
The habits and routines she had established reflected her pre-
accident capabilities. While the evidence supports the
reasonable inference that Palla may lead a remarkable,
accomplished life, it also supports the finding that she has had
to dedicate much of the past three years to learning how to
change those habits and routines to account for the fact that
she now moves through the world differently. And as the
testimony showed, this learning process has come with a
significant amount of physical and emotional suffering. Among
other things, Palla learned firsthand how driving and walking in
the snow is different with two legs than it is with one; how
revealing her disability subjects her to shame, while hiding
elicits skepticism of her needs; how chronic pain and fatigue
forces her to make sacrifices most young adults don't have to
make; and how spontaneity is far less achievable when wholly
relying on a prosthetic device for mobility. The Court finds
the pain and suffering associated with restarting her life as
someone with a transfemoral amputation was most pronounced in
the first year Palla returned to work, but that it has continued
to have significant impact on her life in the nearly two years
since.

In total, the Court awards Palla $8,000,000 in total past

1  non-economic damages.

2  5. Future Non-economic Damages

3      Plaintiff claims future non-economic damages.  The Court
4  finds Palla's future pain and suffering will be significant.
5  She will always face reminders of the physical limitations that
6  her disability places upon her life.  Emotional pain aside, the
7  testimony showed that, as a result of her injury, Palla is
8  likely to suffer from some degree of physical pain for the rest
9  of her life—phantom pain, pain in her residual limb, and pain in
10 her contralateral muscles and joints.  The Court must adequately
11 compensate her for an injury whose effects will be felt for
12 nearly six more decades.

13     But Palla is resilient.  And while the Court does not
14 penalize her for that resiliency, it must account for the
15 evidence that showed Palla's ability to cope with the pain and
16 suffering accompanying her disability is likely to improve with
17 time up until the latter stages of her life when she will be
18 much less mobile and at greater risk to injury due to a fall.
19 As a result, the Court finds that $2,500,000 will reasonably and
20 fairly compensate Palla's pain and suffering from December 2019
21 through December 2026; $2,000,000 will reasonably and fairly
22 compensate her pain and suffering from January 2027 through
23 December 2036; $2,000,000 will reasonably and fairly compensate
24 her pain and suffering from January 2036 to December 2046;
25 $2,000,000 will reasonably and fairly compensate her pain and
26 suffering from January 2047 to December 2056; and $3,500,000
27 will reasonably and fairly compensate her pain and suffering
28 from January 2057 to May 2076.  In total, the Court awards Palla

22

1  $12,000,000 in future non-economic damages.

2       B.  Mitigation

3       In its closing argument, L M Sports argued the Court should
4  reduce Palla's damages because she failed to mitigate them.  L M
5  Sports correctly argues plaintiffs have a duty to mitigate both
6  economic and non-economic damages.  See Gomez v. American
7  Empress Ltd. Partnership, 189 F.3d 473 (9th Cir. 1999).  Even
8  so, a defendant arguing a plaintiff failed to mitigate damages
9  bears the burden of proving two elements by a preponderance of
10 the evidence: (1) that the plaintiff failed to use reasonable
11 efforts to mitigate damages; and (2) the amount by which damages
12 would have been mitigated.  Model Civ. Jury Instr. 9th Cir. 5.3.
13 The Court finds L M Sports failed to satisfy its burden.

14      L M Sports argues Palla's failure to make more concerted
15 efforts toward attending to her physical and mental health
16 amount to a failure to mitigate damages.  It suggests Palla
17 could have used the time she's spent traveling to acquire an
18 orthopedist and a physiatrist in Philadelphia, attend physical
19 therapy sessions, go to counseling, or join a support group.
20 L M Sports also argues Palla's disavowal of prescription pain
21 medication, cannabis, and CBD likewise reflect plaintiff's
22 unwillingness to mitigate the harm she has suffered and
23 continues to experience.  Finally, it argues Palla has
24 volitionally made life harder upon herself through the
25 apartments she has chosen to live in and her refusal to request
26 accommodations in airports or at work.

27      Although Defendant, Dr. Palla, Koeltl, and the Court might
28 like to see Palla spend more time trying different modalities

23

for physical and emotional relief, that is not the only question at hand. Rather, Defendant must also show that by engaging in these specific efforts, Palla would have, more likely than not, alleviated her injuries in some respect. See Model Civ. Jury Instr. 9th Cir. 5.3. This, L M Sports did not do. Palla testified she had, at various points, tried counseling, physical therapy, hypnosis, and a support group. She, then, gave reasoned, and unrefuted, explanations for why she did not find those services helpful. She explained that she foregoes prescription pain medications because of the physical effect they have on her and her fear of becoming dependent on them. She also need not explain why she has not yet experimented with substances that are still illegal under federal law.

The Court does not disagree with L M Sports's argument that Palla has not chosen the most intuitive living arrangements given her amputation. Even so, L M Sports failed to adduce any evidence that Palla had other, comparable housing options that, if chosen, would have likely reduced her non-economic damages. Likewise, it did not show what types of travel and work accommodation Palla could have sought out or how they would have eased her suffering, if requested.

In short, the Court agrees that Palla could have taken more reasonable efforts to mitigate her damages over the past two and a half years. But L M Sports fell far short of proving the amount by which damages would have been mitigated had she taken those efforts. Accordingly, the Court denies L M Sports's request to reduce Palla's damages on a failure-to-mitigate theory.

24

1    C.    Joint and Several Liability

2         Finally, L M Sports argues that in an admiralty case like

3    this, the law does not require the application of joint and

4    several liability.  But as the Supreme Court and the Ninth

5    Circuit have indicated time and again, it is a "well-established

6    principle" that joint and several liability applies in

7    admiralty.  McDermott, Inc. v. AmClyde, 511 U.S. 202, 220 (1994)

8    ("[T]he well-established principle of joint and several

9    liability . . . . was in no way abrogated by Reliable Transfer's

10   proportionate fault approach."); see also Edmonds v. Compagnie

11   Generale Transatlantique, 443 U.S. 256, 271 n.30 (1979);

12   Lundquist v. U.S., 116 F.3d 1486 (9th Cir. 1997); see also Moreno

13   v. Ross Island Sand & Gravel, Co., 704 Fed. Appx. 716 (9th Cir.

14   2017).  Neither court has distinguished between cases involving

15   commercial ventures and those involving recreational ones or

16   alluded to the prudence of such a distinction.  This Court sees

17   no reason to do so now.  The Court therefore finds that joint

18   and several liability applies in this case.

19

20             III.    CONCLUSIONS OF LAW AS TO DAMAGES

21        For the reasons set forth above, the Court concludes as

22   follows:

23        1.    Palla's past economic damages are **$305,762.03**.

24        2.    Palla's non-adjusted future economic damages are

25   **$2,912,344.63**

26        3.    Palla's past non-economic damages are **$8,000,000**.

27        4.    Palla's future non-economic damages are **$12,000,000**.

28        5.    L M Sports did not show, by a preponderance of the

                                25

1  evidence, that Palla failed to mitigate her damages.

2    6.   L M Sports and Paul Garcia are jointly and severally
3  liable.

4

5                          IV.   ORDER

6    The Court finds that Plaintiff Manisha Palla is entitled to
7  recover **$20,305,762.03** for past economic damages, past non-
8  economic damages and future non-economic damages. Palla is also
9  awarded the present value of **$2,912,344.63** for future economic
10  damages.  Within 30 days of this Order, the parties must file
11  supplemental reports from their economists calculating the
12  present value of this amount.  Alternatively, the parties may
13  stipulate to a present value amount.

14    IT IS SO ORDERED.

15  Dated: December 2, 2019

16

17                              JOHN A. MENDEZ
                               United States District Judge

18

19

20

21

22

23

24

25

26

27

28

                              26

# EXHIBIT 1

| Age | Year | Walking Prosthesis | Walking Socket | Sports Prosthesis | Sports Socket | Backup Prosthesis | Foot Orthotic |
|---|---|---|---|---|---|---|---|
| 25 | 2019 | | | $33,188.19 | | | $357.10 |
| 26 | 2020 | | | | | | |
| 27 | 2021 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 28 | 2022 | | | | | | |
| 29 | 2023 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 30 | 2024 | | | | | | |
| 31 | 2025 | | | | | | |
| 32 | 2026 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 33 | 2027 | | | | | | |
| 34 | 2028 | | $19,064.22 | $33,188.19 | | | |
| 35 | 2029 | | | | | | |
| 36 | 2030 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 37 | 2031 | | | | | | |
| 38 | 2032 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 39 | 2033 | | | | | | |
| 40 | 2034 | | | | | | |
| 41 | 2035 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 42 | 2036 | | | | | | |
| 43 | 2037 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 44 | 2038 | | | | | | |
| 45 | 2039 | | | | | | |
| 46 | 2040 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 47 | 2041 | | | | | | |
| 48 | 2042 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 49 | 2043 | | | | | | |
| 50 | 2044 | | | | | | |
| 51 | 2045 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 52 | 2046 | | | | | | |
| 53 | 2047 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 54 | 2048 | | | | | | |
| 55 | 2049 | | | | | | |
| 56 | 2050 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 57 | 2051 | | | | | | |
| 58 | 2052 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 59 | 2053 | | | | | | |
| 60 | 2054 | | | | | | |
| 61 | 2055 | $89,596.48 | | | $19,064.22 | | $357.10 |
| 62 | 2056 | | | | | | |
| 63 | 2057 | | $19,064.22 | $33,188.19 | | | $357.10 |
| 64 | 2058 | | | | | | |
| 65 | 2059 | $89,596.48 | | | | $22,336 32 | $357.10 |
| 66 | 2060 | | | | | | |
| 67 | 2061 | | | | | | |
| 68 | 2062 | | $19,064.22 | | | | $357.10 |
| 69 | 2063 | | | | | | |
| 70 | 2064 | | | | | | |
| 71 | 2065 | $89,596.48 | | | | $22,336 32 | $357.10 |
| 72 | 2066 | | | | | | |
| 73 | 2067 | | | | | | |
| 74 | 2068 | | $19,064.22 | | | | $357.10 |
| 75 | 2069 | | | | | | |
| 76 | 2070 | | | | | | |
| 77 | 2071 | $89,596.48 | | | | $22,336 32 | $357.10 |
| 78 | 2072 | | | | | | |
| 79 | 2073 | | | | | | |
| 80 | 2074 | | $19,064.22 | | | | $357.10 |
| 81 | 2075 | | | | | | |
| **Total** | | $985,561.28 | $209,706.42 | $298,693.71 | $152,513.76 | $67,008 96 | $7,856.20 |

| Prosthesis Maintenance | Physiatrist | Orthopedist | Accupuncture | PT | OT | Counseling | ER |
|---|---|---|---|---|---|---|---|
| $3,354.53 | $1,745.80 | $209.95 | $2,314.68 | $744.24 | $227.21 | | |
| | $1,745.80 | | $2,314.68 | $744.24 | | | |
| $10,901.78 | $872.90 | | $2,314.68 | $744.24 | $227.21 | | |
| | $872.90 | $209.95 | $2,314.68 | $744.24 | | | |
| $5,260.95 | $872.90 | | $2,314.68 | $744.24 | | | |
| | $872.90 | | $2,314.68 | $744.24 | $227.21 | | |
| | $872.90 | $209.95 | $2,314.68 | $744.24 | | | |
| $10,901.78 | $872.90 | | $2,314.68 | $744.24 | | $186.03 | |
| | $872.90 | $209.95 | $2,314.68 | $744.24 | | $186.03 | |
| $5,225.24 | $872.90 | | $2,314.68 | $744.24 | $227.21 | $186.03 | |
| | $872.90 | | | $744.24 | | $186.03 | $2,291.37 |
| $10,901.78 | $872.90 | $209.95 | | $744.24 | | $186.03 | |
| | $872.90 | | | $744.24 | | $186.03 | |
| $5,260.95 | $872.90 | | | $744.24 | | $186.03 | |
| | $872.90 | $209.95 | | $744.24 | $227.21 | $186.03 | |
| | $872.90 | | | $744.24 | | $186.03 | |
| $10,901.78 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | | | $1,860.60 | | $186.03 | |
| $5,260.95 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | | | $1,860.60 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | $2,291.37 |
| $10,901.78 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| $5,260.95 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | | | $1,860.60 | | $186.03 | |
| $10,901.78 | $872.90 | $209.95 | | $1,860.60 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| $5,260.95 | $872.90 | | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | $2,291.37 |
| $10,901.78 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | | | $1,860.60 | $227.21 | $186.03 | |
| $5,260.95 | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| | $872.90 | $209.95 | | $1,860.60 | | $186.03 | |
| $10,901.78 | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| $5,260.95 | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| $11,228.99 | $872.90 | $209.95 | | $3,349.08 | | $186.03 | $2,291.37 |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| $1,942.13 | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| $11,228.99 | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| $1,942.13 | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | $2,291.37 |
| | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| $11,228.99 | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| $1,942.13 | $872.90 | $209.95 | | $3,349.08 | $227.21 | $186.03 | |
| | $872.90 | $209.95 | | $3,349.08 | | $186.03 | |
| $172,134.03 | $51,501.10 | $8,817.90 | $23,146.80 | $119,450.52 | $3,408.15 | $9,301.50 | $11,456.85 |

| Knee Arthroscopy | Knee Replacement | Cream | Gym | Meditation Retreats | Power Therapy Table |
|---|---|---|---|---|---|
| | | $1,620.00 | $2,351 58 | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| $19,180.42 | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| $19,180.42 | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | $79,178.71 | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | $2,690.77 |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| | | $1,620.00 | | $2,500.00 | |
| $38,360.84 | $79,178.71 | $92,340.00 | $2,351 58 | $142,500.00 | $21,526.16 |

| Shower Bench | Tens Unit | Electrodes | Crutches | Wheelchair | Resistance Bands | Foam Rollers | Attendant Care |
|---|---|---|---|---|---|---|---|
| $54.74 | $98.78 | $115.80 | $149.99 | $500.00 | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| $54.74 | | $115.80 | | $500.00 | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| $54.74 | | $115.80 | | $500.00 | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| $54.74 | | $115.80 | | $500.00 | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| $54.74 | | $115.80 | | $500.00 | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | | $115.80 | | | $67.47 | $47.78 | $4,290.00 |
| | | $115.80 | | | | $47.78 | $4,290.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $11,440.00 |
| $54.74 | | $115.80 | | $500.00 | | $47.78 | $11,440.00 |
| | | $115.80 | | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | | $115.80 | | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $11,440.00 |
| $54.74 | | $115.80 | | $500.00 | | $47.78 | $11,440.00 |
| | | $115.80 | | | $67.47 | $47.78 | $11,440.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | | $115.80 | | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| $54.74 | $98.78 | $115.80 | $149.99 | $500.00 | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | | $115.80 | | | $67.47 | $47.78 | $11,440.00 |
| | | $115.80 | | | | $47.78 | $11,440.00 |
| | $98.78 | $115.80 | $149.99 | | $67.47 | $47.78 | $11,440.00 |
| $437.92 | $1,481.70 | $6,600.60 | $2,249.85 | $4,000.00 | $1,956.63 | $2,723.46 | $394,680.00 |

| Wound Care | Total | PV |
|---|---|---|
| | $56,628.61 | |
| | $13,378.30 | |
| | $132,719.66 | |
| | $12,715.35 | |
| | $70,692.10 | |
| | $12,732.61 | |
| | $12,782.82 | |
| $100.00 | $135,956.52 | |
| | $13,217.62 | |
| | $70,396.29 | |
| | $12,735.59 | |
| | $130,506.28 | |
| $100.00 | $10,792.99 | |
| | $68,247.21 | |
| | $10,881.38 | |
| $200.00 | $33,002.68 | |
| | $131,938.88 | |
| | $11,493.11 | |
| $100.00 | $69,740.99 | |
| | $11,720.32 | |
| | $14,310.67 | |
| | $131,622.64 | |
| | $15,016.04 | |
| $100.00 | $69,673.52 | |
| | $12,019.30 | |
| | $11,493.11 | |
| | $131,917.32 | |
| | $11,703.06 | |
| | $69,679.81 | |
| | $11,703.06 | |
| | $17,307.41 | |
| $200.00 | $131,822.64 | |
| | $12,036.56 | |
| | $69,573.52 | |
| | $11,770.53 | |
| | $30,883.48 | |
| $100.00 | $140,904.57 | |
| | $23,587.05 | |
| | $78,279.47 | |
| | $20,341.54 | |
| | $225,646.75 | |
| $100.00 | $20,441.54 | |
| | $20,636.22 | |
| | $41,704.99 | |
| | $20,657.78 | |
| | $23,587.05 | |
| | $144,155.11 | |
| $200.00 | $20,541.54 | |
| | $20,884.99 | |
| | $41,704.99 | |
| | $22,700.38 | |
| $100.00 | $20,668.75 | |
| | $147,422.18 | |
| | $20,568.75 | |
| | $20,409.01 | |
| | $41,932.20 | |
| $100.00 | $20,757.78 | |
| $1,400.00 | $2,912,344.63 | |